JUDGE KARAS

# 12 CIV 2937

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

E.J. BROOKS COMPANY d/b/a
TYDENBROOKS,

            Plaintiff,

     v.

CAMBRIDGE SECURITY SEALS, CAMBRIDGE
RESOURCES, BRIAN LYLE, JACK WALLIN,
JUSTIN HAYES, FERNANDO DaROSA,
MICHAEL GIZZARELLI,
GURMEET SINGH GROVER, RICHARD
WEIGAND and JOHANNA BRIDGES,

            Defendants.

------------------------------------------------------x

C.A. No. _____

TRIAL BY JURY DEMANDED

U.S. DISTRICT COURT
FILED
APR 12 2012
S.D. OF N.Y.

### VERIFIED COMPLAINT FOR INJUNCTIVE AND MONETARY RELIEF

Plaintiff, E.J. Brooks Company, d/b/a TydenBrooks ("TydenBrooks" or "Plaintiff"), by and through its undersigned counsel, for its Complaint against Defendants Cambridge Security Seals ("CSS"), Cambridge Resources ("Cambridge") (together, with CSS, the "Cambridge Defendants"), and certain former employees Brian Lyle, Jack Wallin, Justin Hayes, Fernando DaRosa, Michael Gizzarelli, Gurmeet Singh Grover (a.k.a. Grover Singh), Richard Weigand, and Johanna Bridges (collectively, "Former Employee Defendants"), for damages, attorneys' fees, and injunctive relief for violations of the Lanham Act 15 U.S.C. § 1125(a), and New York statutory and common law, states and alleges as follows:

### NATURE OF THE ACTION

1.    Defendants have stolen Plaintiff's confidential and protected manufacturing process. Currently, as of the filing of this action, Defendants are using that process for their own

7123228 v1

pecuniary gain, to poach Plaintiff's customers, and to deceive and confuse customers in the marketplace. Without this Court's immediate action enjoining Defendants from their unrelenting and ongoing use of Plaintiff's trade secrets, Plaintiff will continue to suffer substantial and irreparable harm.

2.       Plaintiff is in the business of designing, manufacturing, and selling plastic security seals.   In its business, efficiency, accuracy, and speed in the manufacturing process are all of paramount importance.  Realizing this, Plaintiff, through its predecessors in interest, set out to refine their process in order to deliver its customers a high quality product at a lower cost. Pursuant to that end, Plaintiff sought to develop a fully-automated manufacturing process associated with its two-part plastic indicative seal.

3.       Plaintiff invested significantly in the design, development, and implementation of a new, and fully-automated manufacturing process.  During the development phase, once it had successfully devised its process, Plaintiff actively worked to shield its innovation from public disclosure, especially to its competitors.   Despite its best efforts, Defendants surreptitiously conspired to take Plaintiff's unique and confidential process.

4.       The Cambridge Defendants have used Plaintiff's own trade secrets and confidential information to design, develop and implement a fully-automated manufacturing process that it is using to produce a product or products directly competitive to Plaintiff.  In addition, the Cambridge Defendants also have used Plaintiff's confidential customer information. In short: The Cambridge Defendants are using Plaintiff's own innovation and other confidential information against it and they will not stop unless ordered by this Court.

5.       In addition to the misappropriation of Plaintiff's trade secrets, The Cambridge Defendants have also disseminated false and misleading advertisements and marketing materials

about their competing security seal products and their market position to the detriment of Plaintiff. In sum, Defendants' actions violate laws that were designed to protect against such misdeeds, including the Lanham Act 15 U.S.C. § 1125(a), and New York statutory and common law.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) as this is an action arising under, *inter alia*, the "Lanham Act," 15 U.S.C. § 1125(a).

7.     As a result, this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as the state law claims arise from the same common nucleus of operative facts as the federal claims.

8.     This Court has personal jurisdiction over the Cambridge Defendants because they reside in New York, the acts complained of in this Complaint were committed by the Cambridge Defendants against Plaintiff in New York, and/or the Cambridge Defendants' actions resulted in irreparable and ongoing injuries suffered by Plaintiff in New York.

9.     This Court has personal jurisdiction over the Former Employee Defendants because, upon information and belief, they are all citizens of New York and/or have sufficient minimum contacts with New York, and/or the acts complained of in this Complaint were committed by the Former Employee against Plaintiff, and the Former Employee Defendants actions resulted in irreparable and ongoing injuries suffered by Plaintiff in New York.

10.     Venue as to the Defendants is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because, upon information and belief, a substantial part of the events giving rise to the claims at issue occurred within the territorial jurisdiction of this Court.

## THE PARTIES

11.     Plaintiff is a New Jersey corporation.  Plaintiff has its principal place of business at 227 North Route 303, Suite 101, Congers, New York 10920.

12.     Defendant CSS is a New York limited liability company having its principal place of business at One Cambridge Plaza, Pomona, New York 10970.  The New York State Department of State indicates that it will mail service of process accepted on behalf of this entity to Andrew Greene & Associates, P.C., 202 Mamaroneck Avenue, White Plains, New York, 10601.

13.     Defendant Cambridge is a New York limited liability company having its principal place of business at 960 Alabama Avenue, Brooklyn, New York 11207.  The New York State Department of State indicates that it will mail service of process accepted on behalf of this entity to Cambridge Resources, LLC, 41 State Street, Suite 106, Albany, New York, 12207.

14.     Defendant Brian Lyle is an individual last known to reside at 42 Krystal Drive, Somers, New York 10589.

15.     Defendant Jack Wallin is an individual last known to reside at 8 Lauren Lane, Bayville, New York 11709.

16.     Defendant Justin Hayes is an individual last known to reside at 1492 Walsh Drive, Yorkville, Illinois 60560.

17.     Defendant Fernando DaRosa is an individual last known to reside at 25 Fawn Hill Drive, Monsey, New York 10952.

18.     Defendant Michael Gizzarelli is an individual last known to reside at 39 Kettle Court, Newburgh, New York 12550.

19.     Defendant Gurmeet Singh Grover is an individual last known to reside at 91 Truman Blvd., Oakland, New Jersey 07436.

20.     Defendant Richard Weigand is an individual last known to reside at 14 Dederer Street, Tappan, New York, 10983.

21.     Defendant Johanna Bridges is an individual last known to reside at 16 Old Route 17M, Chester, New York, 10918.

## STATEMENT OF FACTS
### *Background*

22.     Plaintiff TydenBrooks is a leading manufacturer and marketer of premium security seals, including indicative, or tamper-evident, seals.

23.     Security seals are used for a variety of shipping purposes including air cargo, anti-counterfeit barrier, cross border, electronic, food transportation, and U.S. customs.  A number of industries regularly use security seals, including airline, retail, government and freight transport firms, to ensure the tamper-free transfer of goods.

24.     There are generally two varieties of security seals: (i) heavy duty seals designed to prevent tampering with goods, and (ii) indicative seals attached to freight containers or goods that are designed to indicate whether tampering has occurred.  Indicative seals are typically used on tanker trucks, bulk containers, plastic tote boxes containing retail goods, and airline carts containing food and beverage items.  Plaintiff's innovative and new manufacturing process, and Defendants' successful theft of it, is used to make the indicative seals at-issue in this case.

25.     In or about December, 2011, Stoffel Seals Corporation, a New York Corporation, underwent a restructuring and was merged into Stoffel Holding Company, a Delaware

Corporation.  Stoffel Holding Company survived that transaction and assumed all of Stoffel

Seals Corporation's rights and obligations, including the standing, right, and ability to prosecute

this action.

26.     Likewise, in or about December, 2011 as part of the same transaction, Stoffel

Holding Company was merged into Plaintiff E.J. Brooks Company.  By this merger, effective on

December 31, 2011, E.J. Brooks Company, as the surviving entity, assumed all of Stoffel

Holding Company's rights and obligations, including the standing, right, and ability to prosecute

this action.

27.     Plaintiff E.J. Brooks Company has the standing, right, and ability to prosecute

this action and is otherwise the successor-in-interest to Stoffel Seals Corporation.

28.     In this Complaint, "Plaintiff" or "TydenBrooks" shall refer to E.J. Brooks

Company, d/b/a TydenBrooks and Stoffel Seals Corporation, and/or Stoffel Seals Holding

Company.

29.     This action concerns the highly innovative, confidential, and proprietary

manufacturing processes that Plaintiff designed, developed, and implemented to produce

indicative security seals, including Plaintiff's "Tug Tight Adjustable Seal" and its "Plastic Truck

Seal."  More specifically, the proprietary trade secrets at the heart of this case relate to Plaintiff's

innovative and fully-automated processes used to manufacture Plaintiff's security seals, which

Plaintiff designed, developed, and implemented over a number of years (hereinafter referred to

as the "Confidential Process").

### *Plaintiff's Development of Fully-Automated and Proprietary Manufacturing Process*

30.     Plaintiff, like many of its competitors, once used only semi-automated

manufacturing processes for the manufacture of its plastic indicative security seals ("security

seals" are the seals at issue in this case).  For seals sold in the United States, semi-automated manufacturing processes are more laborious, slower, and more costly than the fully-automated process at-issue in this case.

31.     Indicative security seals are typically "one-part" or "two-part seals."  A two-part seal, such as the seals manufactured by Plaintiff, include a locking mechanism that is different from a one-part seal.  This locking mechanism has wide appeal to the applicable security seal market and is preferable for certain clients but, for a long time, was not an option for customers because of the cost.

32.     Plaintiff recognized that to radically increase its throughput, accuracy, and capabilities, it had to develop a fully-automated production process.  It further realized that a fully-automated process would enable it to distinguish itself from its competitors.

33.     Before Plaintiff's design, development, and implementation of the Confidential Process, Plaintiff (along with its competitors) utilized semi-automated processes for their manufacture.  This made the two-part seals more expensive for the customers.  Plaintiff's Confidential Process shifted that paradigm by allowing it to produce two-part seals at a lower cost for, among other things, labor and shipping than ever before.

34.     Upon information and belief, no other security seal company in the United States used a fully-automated manufacturing process for two-part seals prior to Plaintiff's development of the Confidential Process.

35.     Plaintiff identified a market for a product (the two-part seal), a way to improve upon that market (manufacturing a less expensive two-part seal), and a way to make it all happen (develop a fully-automated process).

36.     The road from a semi-automated to fully-automated process, however, was certain to be a costly endeavor.  A "game changing" innovation like the Confidential Process is not designed and developed quickly.  It took Plaintiff a significant amount of time and a substantial investment to transform the Confidential Process from an idea to a reality.

37.     To that end, starting around the late 1990s, Plaintiff's engineering team worked to design, develop and implement fully-automated processes for superior two-part plastic indicative seals.  Plaintiff's engineering team during the times relevant hereto included Former Employee Defendants Michael Gizzarelli, Fernando DaRosa, Gurmeet Singh Grover ("Grover Singh"), Richard Weigand, and Johanna Bridges.  Beginning in 2005, Mr. Gizzarelli became Plaintiff's Engineering Manager, leading Mr. DaRosa, Mr. Singh, Mr. Weigand, and Ms. Bridges in the design, development, implementation, and improvement of the fully-automated process.

38.     During that time, given its significant potential value to the company, Plaintiff expended considerable resources improving on the design and development of its fully-automated processes.

39.     In fact, improvements to the design of the Confidential Process between approximately 2004 and 2010 dramatically increased Plaintiff's manufacturing productivity and output of the superior two-part plastic indicative seals.  Such improvements were designed, developed and implemented by the Former Employee Defendant members of Plaintiff's engineering team led by Mr. Gizzarelli.  These improvements were driven, in large part, by ever-increasing demand for the high quality, inexpensive seals manufactured by Plaintiff using the Confidential Process.

40.     Plaintiff's use of the Confidential Process to manufacture its two-part plastic indicative seals, including the Tug Tight Adjustable Seal and the Plastic Truck Seal, immediately

provided Plaintiff with a distinct advantage in a highly-competitive market by providing a stronger two-part plastic indicative seal at a lower price than any of its competitors.

41. Moreover, rather than being outsourced to lower cost countries, the seals could be manufactured and finished in the United States, thereby avoiding shipping and other importation costs, and also providing just-in-time delivery to customers.

42. These competitive advantages are significant, are continuing and have enabled Plaintiff to dramatically grow its share of the security seals market and increase its revenues.

### *Plaintiff Carefully Guards its Competitively Sensitive Information and Trade Secrets, Including the Confidential Process at Issue in this Case*

43. Plaintiff knew full well the cost of developing the Confidential Process and went to great lengths to protect the secrecy and confidentiality its investment, and hence its competitive advantage.

44. Each employee of Plaintiff was bound by applicable legal duties to guard Plaintiff's confidential information and trade secrets, including the Confidential Process.

45. Additionally, governing employment agreements and policies (e.g., Stoffel Seals' Statement of Principles of Conduct) mandated that each employee, including the Former Employee Defendants, protect Plaintiff's confidential and proprietary information.

46. Plaintiff made certain to regularly and unambiguously remind its employees of their duties to protect confidential information and the inherent value of that data in a competitive marketplace.

47. In addition to continually advising its employees of their duties to maintain the secrecy of sensitive and proprietary trade secretes, Plaintiff employed a myriad of quantifiable safeguards to protect its confidential information.

48.     For example, during the design, development, and implementation of the Confidential Process, Plaintiff consistently restricted access to the company's engineering documents (including engineering documents relating to the Confidential Process) by, among other things: (i) making confidential documents password protected, (ii) storing confidential documents on completely separate internal servers, and (iii) providing only the engineering department employees with access to the company's engineering documents, thereby restricting all other employees from accessing the confidential engineering documents.

49.     Plaintiff has also required that if any hard copies of confidential, password protected engineering documents were made, engineering employees understood that those hard copies were to be marked confidential and not freely disseminated or shared, especially with those not affiliated with the Company.

50.     Throughout the implementation and evolution of the Confidential Process, Plaintiff has continued to employ these methods to protect its confidential, proprietary and trade secret information in the Confidential Process.

51.     Plaintiff has also taken steps to ensure that visitors to their manufacturing facility do not record, copy or otherwise reveal Plaintiff's confidential, proprietary and trade secret information relating to their manufacturing processes, including the Confidential Process. Plaintiff requires visitors to its manufacturing facility to agree to maintain the confidentiality of Plaintiff's proprietary information.

52.     All information relating to Plaintiff's customers including, but not limited to, customer names, sales data, sales projections, and purchasing habits, is also protected in a similar manner as confidential engineering documents.

### *Brian Lyle's Departure from Stoffel Seals*

53.     In February 2009, Former Employee Defendant Brian Lyle, Business Unit Manager for Plaintiff since 1999, resigned.  Upon information and belief, Mr. Lyle resigned in order to work for Cambridge to develop its security seals business.

54.     As Business Unit Manager for Plaintiff, Mr. Lyle managed all aspects of marketing programs for certain products, including the Tug Tight Adjustable Seal and Plastic Truck Seal, and he was responsible for developing strategic partnerships with customers and suppliers.

55.     Plaintiff entrusted Mr. Lyle with proprietary and confidential trade secrets and other sensitive information.

56.     Mr. Lyle was in the "eye of the hurricane" during Plaintiff's design, development, and implementation of the Confidential Process.

57.     Specifically, while at Stoffel Seals, Mr. Lyle gained valuable and extraordinarily detailed knowledge of the design, development and implementation of the Confidential Process.

58.     Mr. Lyle also had knowledge of and access to Plaintiff's valuable information regarding its customer information and relationships, including their interest in Plaintiff's security seals products, including Tug Tight Adjustable Seals and Plastic Truck Seals.

59.     During his time with Plaintiff and during the period in which the Confidential Process was being designed, developed and implemented, Mr. Lyle was aware that Plaintiff considered certain information proprietary, and that Plaintiff restricted employee access to that information.

60.     Mr. Lyle also signed an employment agreement containing a confidentiality provision restricting him from revealing to anyone outside the company any confidential,

proprietary or trade secret information, or to use or permit to be used outside the company, any design materials relating to the business of the company.

61.    Further, Mr. Lyle signed Stoffel Seals' Statement of Principles of Conduct including a duty to maintain the confidentiality of and not use any company confidential, proprietary and trade secret information.

62.    Mr. Lyle was aware that the types of information that he had access to as Business Unit Manager was considered proprietary and trade secret information.

63.    Upon information and belief, Mr. Lyle began working for Cambridge and/or CSS in March 2009, immediately after leaving Plaintiff, in a virtually identical position to the one he held for Plaintiff.

### *Cambridge Security Seals Appears in the Market*

64.    Cambridge describes itself in advertising and press releases as a 60-year old global manufacturer of industrial products.

65.    It was not until early 2009 that Cambridge added security seals to its product offerings.  Prior to that time, Cambridge advertised itself as the preferred supplier of cable ties, hose clamps, HVAC duct support, wire connectors, and "other products," but did not advertise that it sold or manufactured security seals.  In fact, Cambridge was Plaintiff's customer for various security seals and other products manufactured and sold by Plaintiff.

66.    Upon information and belief, in or around May 2009, three months after Mr. Lyle began working for Cambridge, Cambridge first advertised security seals as part of its product line on its website.

67.    Upon information and belief, in December 2010, CSS, previously a division of Cambridge, became an independent entity entirely focused on the security seals market.

### *Stoffel Seals' Key Engineering and Sales Employees Defect to CSS*

68.     In January 2011, three key members of the Plaintiff's engineering team that designed, developed and implemented the Confidential Process resigned from Plaintiff: Former Employee Defendants Fernando DaRosa, Michael Gizzarelli, and Grover Singh.   Upon information and belief, these three Former Employee Defendants resigned from Plaintiff in order to work for CSS.

69.     Michael Gizzarelli began working for Plaintiff in 1996 as Assistant Toolroom Foreman.  In 2005, Mr. Gizzarelli became Plaintiff's Engineering Manager.  In this capacity, Mr. Gizzarelli supervised and coordinated the engineering department and was responsible for the research and development of new product lines.  In his capacity as Engineering Manager, Mr. Gizzarelli was involved in the design, development and implementation of the Confidential Process.  Mr. Gizzarelli resigned from Plaintiff in January 2011 and, upon information and belief, began working for CSS shortly thereafter in a position virtually identical to that held with Plaintiff.

70.     Fernando DaRosa began working for Plaintiff in 1972.   At the time of his resignation in January 2011, Mr. DaRosa was Plant Manager.  In that capacity, Mr. DaRosa was involved in the design, development and implementation of the Confidential Process.  Upon information and belief, Mr. DaRosa began working for CSS shortly after his departure from Plaintiff in a position virtually identical to that held with Plaintiff.

71.     Grover Singh began working for Plaintiff in 1999 and served as Corporate Design Engineer and Tool Room Supervisor during the time that the Confidential Process was designed, developed and implemented.  During his employment with Plaintiff, Mr. Singh was involved in the design, development and implementation of the Confidential Process.  Mr. Singh served in a

leadership role for process and product improvements, managed the design of new and existing products, and developed project plans for new products.   One of Mr. Singh's tasks was to prepare detailed drawings for molds, metal punch press dies, tools, machine parts and assembly machine designs.  Mr. Singh resigned from Plaintiff in January 2011 and, upon information and belief, began working for CSS shortly after his departure in a position virtually identical to that held with Plaintiff.

72.     In March 2011, another key member of Plaintiff's engineering team, Former Employee Defendant Johanna Bridges, Corporate Engineering Technician, resigned from Plaintiff in order to work for CSS.  Ms. Bridges began working for Stoffel Seals in July 2010 as a Corporate Engineering Technician.  In this capacity, Ms. Bridges served in a leadership role for process and product improvements and developments, and assisted with the design of new products and processes.   Ms. Bridges was also responsible for setting up equipment and providing training on that equipment.  During her employment with Plaintiff, Ms. Bridges was involved in the design, development and implementation of the Confidential Process.  Upon information and belief, Ms. Bridges began working for CSS in March 2011, the same month of her resignation from Plaintiff, in a position virtually identical to that held with Plaintiff.

73.     In July 2011, yet another key member of the engineering team, Defendant Richard Weigand, Tool & Die Maker, resigned from Plaintiff in order to work for CSS.  Mr. Weigand began working for Plaintiff in 1990 as a Tool and Die Maker.  In this capacity, Mr. Weigand was responsible for building and repairing machine shop tools, dies, jigs and molds.  During his employment with Plaintiff, Mr. Weigand was involved in the design, development and implementation of the Confidential Process.  Upon information and belief, Mr. Weigand began

working for CSS immediately following his departure from Plaintiff in a position virtually identical to that held with Plaintiff.

74.     In addition to Mr. Lyle, two other key sales and marketing employees left their employment with Plaintiff between 2009 and 2011, and subsequently began working for Cambridge and/or CSS in positions virtually identical to those held with Plaintiff:   Former Employee Defendants Justin Hayes and Jack Wallin.

75.     Justin Hayes was a District Sales Manager for Plaintiff.   He left Plaintiff in September 2008, and, upon information and belief, began working for Cambridge in May 2009.

76.     Jack Wallin began working for Plaintiff in 2001 as Regional Sales Manager for the New York and Northeast region.   In that capacity, Mr. Wallin was responsible for planning, organizing, implementing and executing sales programs.   Mr. Wallin was terminated in October 2010 as part of a reduction in force.   Upon information and belief, Mr. Wallin began work for CSS in January 2011.

77.     While employed by Plaintiff, Mr. Hayes and Mr. Wallin had access to Plaintiff's confidential, proprietary and trade secret information relating to its Confidential Process, marketing plans, and customer information, among other things.

78.     Upon information and belief, Cambridge and/or CSS induced the departure of the aforementioned Former Employee Defendants from Plaintiff between 2009 and 2011, or subsequently hired them following their departure, in a campaign to gain access to and then misappropriate Plaintiff's confidential, proprietary and trade secret information relating to its Confidential Process, as well as marketing plans, and customer information in order to directly compete with Plaintiff in the market for security seals.

79.     The departure of the Former Employee Defendants from Plaintiff and their subsequent employment with Cambridge and/or CSS coincided with key events in Cambridge's and CSS's development of their security seals business.

80.     For example, shortly after Mr. Lyle and Mr. Wallin left Plaintiff in February 2009 and October 2010 respectively, CSS, on information and belief, spun-off from Cambridge in December 2010 to become an independent entity focused on the security seals market.

### *The Cambridge Defendants' Misappropriation of Plaintiff's Trade Secrets*

81.     In November 2011, CSS announced it completed its first month of shipping orders from its new manufacturing facility in Pomona, New York.  Nothing in the announcement revealed the details about the nature or extent of the manufacturing processes employed at the new facility.

82.     In February 2012, CSS announced the widespread availability of its product, the Heavy Duty Pull Tight Seal ("HPT"), the press release for which is attached hereto as **Exhibit A**. The HPT product is directly competitive with Plaintiff's Tug Tight Adjustable Seal.

83.     On March 19, 2012, CSS announced the widespread availability of its product, the Plastic Truck Seal, the press release for which is attached hereto as **Exhibit B**.  CSS's Plastic Truck Seal is directly competitive with Plaintiff's Plastic Truck Seal.

84.     Based upon recent public statements from CSS, photographs recently displayed on CSS's website and additional information gleaned from other sources, upon information and belief, CSS is using Plaintiff's Confidential Process to produce the HPT and the Plastic Truck Seal.

85.     In addition to using Plaintiff's Confidential Process, Plaintiff has become aware of the Cambridge Defendants' attempted use of Plaintiff's confidential customer information.

86.     For example, on information and belief, the Cambridge Defendants focused their efforts on obtaining information from Plaintiff's key sales and marketing employees, Mr. Lyle, Mr. Wallin, and Mr. Hayes, about Plaintiff's major customers in the security seals market.

87.     While employed with Plaintiff, Mr. Lyle, Mr. Wallin, and Mr. Hayes knew that Plaintiff considered its customer information to be proprietary, confidential information, and that Plaintiff did not allow the dissemination of that information to third parties.

88.     Since obtaining information on Plaintiff's confidential customer information from Mr. Lyle, Mr. Wallin, and Mr. Hayes, the Cambridge Defendants have successfully interfered with Plaintiff's ongoing business relationship with at least one known customer: Schütz.

89.     Upon information and belief, the Cambridge Defendants were aware of Plaintiff's ongoing business relationship with Schütz, and improperly induced Schütz to order security seals from the Cambridge Defendants instead of from Plaintiff, utilizing Plaintiff's confidential customer information in that process.

90.     In addition to Schütz, Plaintiff is aware that the Cambridge Defendants have contacted other major customers of Plaintiff, upon information and belief, using the confidential customer information of Plaintiff, including, but not limited to: Integrated Support Services, Fire Specialties, and J.J. Keller.

91.     Upon information and belief, the Cambridge Defendants became aware of these customers and their ongoing business relationships with Plaintiff from Mr. Lyle, Mr. Wallin, and Mr. Hayes.

92.     The Cambridge Defendants used the competitive advantage that they have gained from using Plaintiff's business information and Confidential Process in attempting to lure those customers away from Plaintiff.

93.     The Cambridge Defendants succeeded in using that competitive advantage in attracting business from Plaintiff's long-standing customer, Schütz.

### *The Cambridge Defendants' False and Misleading Statements Relating to Their Misappropriation of Plaintiffs' Trade Secrets*

94.     When announcing its launch as an independent company in December 2010, CSS stated that it would attempt to "attract the industry's best talent" and also that it was committed to opening a domestic manufacturing plant in 2011.

95.     Pursuant to that stated intent, CSS hired Plaintiff's key engineering employees in early 2011, precisely during the period when CSS was developing and building a manufacturing facility in Pomona, New York.

96.     CSS stated that it "recognize[d] the industry's strong demand for a high-quality, full service provider of seals with the scope, pricing, turnaround time, and responsive service required for customers both large and small.  We intend to meet all those demands by adding domestic manufacturing to the question."

97.     At the time that CSS released this statement, Plaintiff was already a full service provider of high-quality security seals with domestic manufacturing and finishing.

98.     CSS further advertised itself as having a "diversified team of technical experts and business professionals, including experienced engineering, production, and logistics specialists" and that their "unique blend of management and production expertise enables the company to provide an unmatched level of value."  CSS's "unique" and "experienced" team is Plaintiff's engineering and sales personnel.

99.     In November 2011, CSS announced it completed its first month of shipping orders from its new manufacturing facility in Pomona, New York, the press release for which is attached hereto as **Exhibit C**.

100.    According to CSS, its manufacturing facility in Pomona, New York offers "industry-leading automation." CSS further stated that it "developed a business model based on strategic domestic manufacturing that enables [CSS] to provide higher quality products with quicker turnaround times at competitive and stable pricing." *See* **Exhibit C.**

101.    CSS' statements are false and misleading because they describe precisely the automation and product line that CSS stole from Plaintiff by wrongfully obtaining Plaintiff's confidential, proprietary and trade secret information relating to its Confidential Process.

102.    Additionally, despite knowing that its HPT is a copy of Plaintiff's Tug Tight Adjustable Seal manufactured using Plaintiff's Confidential Process, CSS has advertised its HPT on its website and in the press release announcing the product (*see* **Exhibit A**) as "unique" and as providing customers with "unsurpassed ability" to customize their seals.

103.    Similarly, despite knowing that its Plastic Truck Seal is a copy of Plaintiff's Plastic Truck Seal manufactured using Plaintiff's Confidential Process, CSS has advertised its Plastic Truck Seal on its website and in its press release announcing the product (*see* **Exhibit B**) as "unique" and its seals as the "most durable" and "cost effective products on the market."

<u>**COUNT I**</u>
**(False Advertising Against the Cambridge Defendants, Lanham Act 15 U.S.C. § 1125(a))**

104.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 103 above as if fully set forth in this claim for relief.

105.    This claim arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.*

106.    On the basis of the foregoing paragraphs, the Cambridge Defendants made false or misleading statements regarding the nature and characteristics of the Cambridge Defendants' products or services.

100.    According to CSS, its manufacturing facility in Pomona, New York offers "industry-leading automation." CSS further stated that it "developed a business model based on strategic domestic manufacturing that enables [CSS] to provide higher quality products with quicker turnaround times at competitive and stable pricing." *See* **Exhibit C.**

101.    CSS' statements are false and misleading because they describe precisely the automation and product line that CSS stole from Plaintiff by wrongfully obtaining Plaintiff's confidential, proprietary and trade secret information relating to its Confidential Process.

102.    Additionally, despite knowing that its HPT is a copy of Plaintiff's Tug Tight Adjustable Seal manufactured using Plaintiff's Confidential Process, CSS has advertised its HPT on its website and in the press release announcing the product (*see* **Exhibit A**) as "unique" and as providing customers with "unsurpassed ability" to customize their seals.

103.    Similarly, despite knowing that its Plastic Truck Seal is a copy of Plaintiff's Plastic Truck Seal manufactured using Plaintiff's Confidential Process, CSS has advertised its Plastic Truck Seal on its website and in its press release announcing the product (*see* **Exhibit B**) as "unique" and its seals as the "most durable" and "cost effective products on the market."

## COUNT I
### (False Advertising Against the Cambridge Defendants, Lanham Act 15 U.S.C. § 1125(a))

104.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 103 above as if fully set forth in this claim for relief.

105.    This claim arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.*

106.    On the basis of the foregoing paragraphs, the Cambridge Defendants made false or misleading statements regarding the nature and characteristics of the Cambridge Defendants' products or services.

107.    The Cambridge Defendants' statements have actually deceived and/or are likely to deceive customers as to the position they occupy in the security seals marketplace, the nature of their commercial activities and/or the approval of their processes and products.

108.    The Cambridge Defendants' deception and/or confusion is material and likely to influence the purchasing decisions of security seals customers.

109.    The Cambridge Defendants' misrepresentations were used in commerce.

110.    The Cambridge Defendants' misrepresentations were made in the context of commercial advertising and promotion.

111.    The Cambridge Defendants' improper activities, as described above, have been willful and deliberate, thereby making this an exceptional case under the Lanham Act.

112.    The Cambridge Defendants' actions caused Plaintiff to belief it would be and were, in fact, damaged by the misrepresentations.

113.    The Cambridge Defendants' misrepresentations have an effect on commerce in the United States.

114.    As a direct and proximate result of the Cambridge Defendants' improper activities, Plaintiff has suffered, continues to suffer and will suffer in the future substantial injury, including irreparable injury and damages, including but not limited to loss of sales and profits which Plaintiff would have made but for the false and deceptive advertising by the Cambridge Defendants, as well as loss of market share.

115.    As a direct and proximate result of the Cambridge Defendants' improper activities, Plaintiff has suffered, continues to suffer and will suffer in the future additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proved at trial.

<u>COUNT II</u>
**(False Designation of Origin Against the Cambridge Defendants,**
**Lanham Act 15 U.S.C. § 1125(a))**

116.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 115 above as if fully set forth in this claim for relief.

117.   This claim arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.*

118.   On the basis of the foregoing paragraphs, the Cambridge Defendants made false or misleading statements regarding the origin of the Cambridge Defendants' products or services.

119.   The Cambridge Defendants' misrepresentations were made in the context of commercial advertising and promotion.

120.   The Cambridge Defendants' misrepresentations have an effect on commerce in the United States.

121.   The Cambridge Defendants' deception and/or confusion is material and likely to influence the purchasing decisions of security seals customers.

122.   The Cambridge Defendants' statements have actually deceived and/or are likely to deceive customers as to the position they occupy in the security seals marketplace, the nature of their commercial activities and/or the approval of their processes and products.

123.   The Cambridge Defendants' improper activities, as described above, have been willful and deliberate, thereby making this an exceptional case under the Lanham Act.

124.   The Cambridge Defendants' actions caused Plaintiff to belief it would be and were, in fact, damaged by the misrepresentations.

125.   As a direct and proximate result of the Cambridge Defendants' improper activities, Plaintiff has suffered, continues to suffer and will suffer in the future substantial

injury, including irreparable injury and damages, including but not limited to loss of sales and profits which Plaintiff would have made, but for the false and deceptive advertising made by the Cambridge Defendants relating to the origin of the their products, as well as loss of market share.

126.    As a direct and proximate result of the Cambridge Defendants' improper activities, Plaintiff has suffered, continues to suffer and will suffer in the future additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proved at trial.

## COUNT III
### (False Advertising against the Cambridge Defendants, N.Y. Gen. Bus. L. § 350)

127.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 126 above as if fully set forth in this claim for relief.

128.    On the basis of the foregoing, the Cambridge Defendants have engaged, and are engaging in, consumer-oriented conduct which is deceptive or misleading in a material way.

129.    As a direct and proximate result of the Cambridge Defendants' false advertising, Plaintiff has suffered, continues to suffer and will suffer in the future substantial injury, including irreparable injury and damages, including but not limited to loss of sales and profits to Plaintiff which Plaintiff would have made but for the false and deceptive advertising by the Cambridge Defendants, as well as loss of market share.

130.    As a direct and proximate result of the Cambridge Defendants' false advertising, Plaintiff has suffered, continues to suffer and will suffer in the future additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proved at trial.

## COUNT IV
### (Unfair and Deceptive Business Practices Against the Cambridge Defendants, N.Y. Gen. Bus. L. § 349)

131.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 130 above as if fully set forth in this claim for relief.

132.   On the basis of the foregoing, the Cambridge Defendants have engaged and are engaging in consumer-oriented conduct which is deceptive or misleading in a material way.

133.   The Cambridge Defendants' false, misleading and deceptive statements and representations of fact were and are directed to consumers.

134.   The Cambridge Defendants' false, misleading and deceptive statements of fact are likely to mislead a consumer acting reasonably under the circumstances.

135.   The Cambridge Defendants' false, misleading and deceptive statements of fact have resulted or are likely to result in consumer injury or harm to the public interest.

136.   As a direct and proximate result of the Cambridge Defendants' unfair and deceptive business practices, Plaintiff has suffered, continues to suffer and will suffer in the future substantial injury, including irreparable injury and damages, including but not limited to loss of sales and profits to Plaintiff which Plaintiff would have made but for the unfair and deceptive business practices by the Cambridge Defendants, as well as loss of market share.

137.   As a direct and proximate result of the Cambridge Defendants' unfair and deceptive business practices, Plaintiff has suffered, continues to suffer and will suffer in the future additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proved at trial.

## COUNT V
### (Common Law Misappropriation of Trade Secrets and Confidential Information Against All Defendants)

138.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 137 above as if fully set forth in this claim for relief.

139.    As a result of the Former Employee Defendants employment with Plaintiff, the Former Employee Defendants developed, used, received, and had knowledge of Plaintiff's confidential, proprietary and trade secret information.

140.    Upon information and belief, as a result of Cambridge and/or CSS inducing the Former Employee Defendants to leave Plaintiff and/or hiring them upon their departure, as well as inducing the Former Employee Defendants to disclose and use Plaintiff's confidential, proprietary and trade secret information, the Cambridge Defendants gained access to and used Plaintiff's confidential, proprietary and trade secret information.

141.    The confidential and proprietary information and trade secrets have independent economic value and were not generally known or readily ascertainable by persons other than Plaintiff.

142.    Plaintiff has made and continues to make reasonable efforts to maintain the secrecy of this confidential and proprietary information and trade secrets.

143.    Upon information and belief, the Former Employee Defendants have disclosed, and the Defendants have used, Plaintiff's trade secrets without the express or implied consent of Plaintiff, for their own benefit and the benefit of Cambridge and/or CSS.  This includes, but is not limited to, the Confidential Process, which is protected confidential, proprietary and trade secret information.

144.    The Defendants' improper activities, as described above, have been willful and deliberate, thereby constituting exceptional circumstances.

145.    As a direct and proximate result of the misappropriation of trade secrets and confidential and proprietary information by the Defendants, Plaintiff has suffered, continues to suffer and will suffer in the future extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages including loss of market share for which there is no adequate remedy at law.   Plaintiff will continue to suffer this harm unless and until the Defendants are restrained from their current conduct.

146.    As a direct and proximate result of the Defendants' misappropriation of trade secrets and confidential and proprietary information, Plaintiff has suffered, continues to suffer and will suffer in the future additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proved at trial.

147.    The Defendants committed their actions knowingly, deliberately, and willfully in disregard of Plaintiff's rights.   Accordingly, Plaintiff is entitled to recover exemplary damages in an amount to be determined at trial.

## <u>COUNT VI</u>
### (Common Law Conspiracy to Misappropriate Trade Secrets Against All Defendants)

148.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 147 above as if fully set forth in this claim for relief.

149.    In addition to the allegations relating to Count IV of this Complaint, upon information and belief, the Defendants worked together to misappropriate Plaintiff's confidential, proprietary and trade secret information.

150.    Upon information and belief, the Defendants committed several overt acts in furtherance of their overall goal of misappropriating Plaintiff's confidential, proprietary and trade secret information.

151.    The Defendants knowingly and willfully participated in this plan to misappropriate Plaintiff's confidential, proprietary, and trade secret information.

152.    The Defendants' improper activities, as described above, have been willful and deliberate, thereby constituting exceptional circumstances.

153.    As a direct and proximate result of the Defendants' conspiracy to misappropriate Plaintiff's trade secrets and confidential and proprietary information, Plaintiff has suffered, continues to suffer and will suffer in the future extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages including loss of market share for which there is no adequate remedy at law.  Plaintiff will continue to suffer this harm unless and until the Defendants are restrained from their current conduct.

154.    As a direct and proximate result of the Defendants' conspiracy to misappropriate Plaintiff's trade secrets and confidential and proprietary information, Plaintiff has suffered, continues to suffer and will suffer in the future additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proved at trial.

155.    The Defendants committed their actions knowingly, deliberately, and willfully in disregard of Plaintiff's rights.  Accordingly, Plaintiff is entitled to recover exemplary damages in an amount to be determined at trial.

## COUNT VII
### (Common Law Unfair Competition Against All Defendants)

156.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 155 above as if fully set forth in this claim for relief.

157.    The Former Employee Defendants have acted in bad faith and have engaged in unfair competition against Plaintiff by, among other things, willfully breaching their obligations to maintain Plaintiff's confidential, proprietary and trade secret information, by breaching fiduciary obligations to Plaintiff, and by misappropriating Plaintiff's confidential, proprietary and trade secret information for their own benefit and Defendants' competitive advantage,.

158.    On information and belief, the Cambridge Defendants embarked on and executed a sustained campaign to wrongfully obtain and exploit the confidential and proprietary information and competitive advantages belonging to Plaintiff by inducing the Former Employee Defendants to leave Plaintiff and disclose and use the confidential and proprietary information in violation of their duties to Plaintiff.

159.    These actions constitute unfair competition.

160.    As a direct and proximate result of the Defendants' unfair competition, Plaintiff has suffered, continues to suffer and will suffer in the future extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages including loss of market share for which there is no adequate remedy at law.  Plaintiff will suffer this harm unless and until the Defendants are restrained from their current conduct.

161.    As a direct and proximate result of the Defendants' unfair competition, Plaintiff has suffered, continues to suffer and will suffer in the future additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proved at trial.

162.    The Defendants committed their actions knowingly, deliberately, and willfully in disregard of Plaintiff's rights.  Accordingly, Plaintiff is entitled to recover exemplary damages in an amount to be determined at trial.

<u>COUNT VIII</u><br>
(Common Law Intentional Interference with Business Relations Against the Cambridge<br>
Defendants and Former Employee Defendants Brian Lyle, Jack Wallin, and Justin Hayes)

163.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 though 162 above as if fully set forth in this claim for relief.

164.    A business relationship existed between Plaintiff and its long-time customer Schütz, for the purchase of Plaintiff's security seals including the Tug Tight Adjustable Seal.

165.    The Cambridge Defendants, through Former Employee Defendants Brian Lyle, Jack Wallin, and/or Justin Hayes, were aware of Plaintiff's business relationship with Schütz by virtue of these Former Employee Defendants' employment in the sales and marketing team of Plaintiff prior to their employment with Cambridge and/or CSS.

166.    The Cambridge Defendants wrongfully obtained Plaintiff's customer information through these Former Employee Defendants.

167.    The Cambridge Defendants and/or Former Employee Defendants Brian Lyle, Jack Wallin, and Justin Hayes wrongfully and intentionally induced Schütz to end its business relationship with Plaintiff without justification.

168.    The Cambridge Defendants and Former Employee Defendants Brian Lyle, Jack Wallin, and/or Justin Hayes employed various wrongful, dishonest, unfair and/or improper means to interfere with Plaintiff's business relationship with Schütz, including false advertising, misrepresentation of the nature and origin of CSS's product, and as a result of having wrongfully obtained Plaintiff's confidential, proprietary, and trade secret information.

169.     As a direct and proximate result of the Cambridge Defendants' actions and the actions of Former Employee Defendants Brian Lyle, Jack Wallin, and/or Justin Hayes, Schütz has been induced to do business with the Cambridge Defendants instead of with Plaintiff.

170.     As a direct and proximate result of the Cambridge Defendants' interference with Plaintiff's business relationship with Schütz, Plaintiff has suffered, continues to suffer and will suffer in the future substantial injury, including irreparable injury and damages, including but not limited to loss of sales and profits to Plaintiff which Plaintiff would have made but for the wrongful actions by the Cambridge Defendants and Former Employee Defendants Brian Lyle, Jack Wallin, and Justin Hayes, as well as loss of market share.

171.     As a direct and proximate result of the Cambridge Defendants' interference with Plaintiff's business relationship with Schütz, Plaintiff has suffered, continues to suffer and will suffer in the future additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proved at trial.

172.     These Defendants committed their actions knowingly, deliberately, and willfully in disregard of Plaintiff's rights.  Accordingly, Plaintiff is entitled to recover exemplary damages in an amount to be determined at trial.

<u>**COUNT IX**</u>
**(Common Law Unjust Enrichment Against All Defendants)**

173.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 though 172 above as if fully set forth in this claim for relief.

174.     Defendants benefited and continue to benefit from Defendants' wrongful use and disclosure of Plaintiff's confidential, proprietary, and trade secret information.

175.     Plaintiff has not been and is not adequately compensated for the unauthorized use of their confidential, proprietary and trade secret information by Defendants.

176.    Under the circumstances, the enrichment of Defendants is unjust.

## **JURY DEMAND**

177.    Plaintiff respectfully requests a trial by jury of all issues so triable in this action.

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor as follows:

A.      That the Cambridge Defendants be adjudged to have violated the Lanham Act 15 USC § 1125 as alleged in Counts I and II of this Complaint and that the Plaintiff be awarded preliminary and permanent injunctive relief.  Likewise, that the Cambridge Defendants be required, pursuant to the Lanham Act 15 USC § 1125, to pay Plaintiff the actual and other monetary damages that it has suffered as a result of their conduct and actions, that they disgorge any profits therefrom, that they pay the costs of the action and that they be required to pay Plaintiff three times the amount of actual damages suffered by Plaintiff by virtue of the Cambridge Defendants' willful acts.  Furthermore, that the Cambridge Defendants be required to pay Plaintiff's attorneys' fees by virtue of the violations being an exceptional case.

B.      That the Cambridge Defendants be adjudged to have violated N.Y. Gen. Bus. L. § 350 and N.Y. Gen. Bus. L. § 349 as alleged in Counts III and IV of this Complaint. Likewise, that the Cambridge Defendants be enjoined from such unlawful act or practice, be required to pay Plaintiff the actual damages that it has suffered as a result of their conduct and actions, or statutory damages, whichever is greater, and that the Cambridge Defendants be required to pay Plaintiff three times the amount of actual damages suffered by Plaintiff by virtue of the Cambridge Defendants' willful and knowing acts.  Furthermore, that the Cambridge Defendants be required to pay Plaintiff's attorneys' fees.

C.      That all Defendants be adjudged to have misappropriated Plaintiff's trade secrets as alleged in Count V of this Complaint.  Likewise, that all Defendants be enjoined from such unlawful act or practice, be required to pay Plaintiff the actual and other monetary damages that it has suffered as a result of their conduct and actions, and any other appropriate remedy at law or equity including, but not limited to, the disgorgement of any profits gained therefrom. Furthermore, that the Court find exceptional circumstances warranting the award of punitive damages.

D.      That all Defendants be adjudged to have conspired to misappropriate Plaintiff's trade secrets as alleged in Count VI of this Complaint.  Likewise, that all Defendants be enjoined from such unlawful act or practice, be required to pay Plaintiff the actual and other monetary damages that it has suffered as a result of their conduct and actions, and any other appropriate remedy at law or equity including, but not limited to, the disgorgement of any profits gained therefrom.  Furthermore, that the Court find exceptional circumstances warranting the award of punitive damages.

E.      That all Defendants be adjudged to have engaged in unfair competition with Plaintiff as alleged in Count VII of this Complaint.  Likewise, that all Defendants be enjoined from such unlawful act or practice, be required to pay Plaintiff the actual and other monetary damages that it has suffered as a result of their conduct and actions, and any other appropriate remedy at law or equity including, but not limited to, the disgorgement of any profits gained therefrom.  Furthermore, that the Court find exceptional circumstances warranting the award of punitive damages.

F.      That the Cambridge Defendants and Former Employee Defendants Brian Lyle, Jack Wallin, and Justin Hayes be adjudged to have intentionally interfered with Plaintiff's

business relationships as alleged in Count VIII of this Complaint. Likewise, that the aforementioned Defendants be enjoined from such unlawful act or practice, be required to pay Plaintiff the actual and other monetary damages that it has suffered as a result of their conduct and actions, and any other appropriate remedy at law or equity including, but not limited to, the disgorgement of any profits gained therefrom. Furthermore, that the Court find exceptional circumstances warranting the award of punitive damages.

      G.      That the Defendants be adjudged to have been unjustly enriched as alleged at Count IX of this Complaint and that Defendants be required to disgorge the profits gained as a result of their conduct and actions and any other appropriate equitable remedy including that the Defendants be enjoined from such unlawful act or practice.

      H.      That preliminary and permanent injunctions be entered, among other things, restraining Defendants, and any person in active concert or participation with them, from using or disclosing Plaintiff's confidential, proprietary and trade secret information, including, but not limited to, Plaintiff's customer information and Plaintiff's Confidential Process.

      I.      That the Court award Plaintiff all taxable costs of this action;

      J.      That the Court award Plaintiff with pre- and post-judgment interest;

      K.      That the Court award Plaintiff consequential damages;

      L.      That Defendants be required to return and/or destroy all documents (including Electronically Stored Information) that embody, describe, or otherwise contain Plaintiff's trade secrets as well as its confidential or proprietary information;

M.    That Defendants be required to issue corrective advertising to address their false and/or or misleading statements;

N.    That the Court grant such other and further relief as is just and proper.

DATED:  April 11, 2012

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

By: _____
Nicole D. Galli (NG 2604)
One Liberty Place
1650 Market Street, Suite 3611
Philadelphia, PA 19103-7301
Telephone: (267) 207-2947
Facsimile: (267) 207-2949
ngalli@beneschlaw.com

*Of Counsel*:

Steve M. Auvil
Matthew D. Gurbach
Julia M. Leo
Benesch, Friedlander, Coplan & Aronoff LLP
200 Public Square
Suite 2300
Cleveland, OH  44114-2309
Telephone: (216) 363-4500
Facsimile: (216) 363-4588
sauvil@beneschlaw.com
mgurbach@beneschlaw.com
jleo@beneschlaw.com

Sarah R. Stafford
Benesch, Friedlander, Coplan & Aronoff LLP
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
sstafford@beneschlaw.com

White Plains Center
50 Main Street, Suite 1000
White Plains, NY 10606
Telephone: (914) 682-6812
Facsimile: (914) 682-2600

*Counsel to Plaintiff E.J. Brooks Company d/b/a TydenBrooks*

## VERIFICATION

I, Ralph Mallozzi, as Vice President for Sales & Marketing for E.J. Brooks Company d/b/a TydenBrooks, verify under penalty of perjury as prescribed under 28 U.S.C. § 1746 that the statements set forth in the foregoing Verified Complaint for Injunctive and Monetary Relief are true and correct to the best of my knowledge information and belief, except as to matters therein stated to be upon information and belief, and as to such matters, I verify as aforesaid that I verily believe the same to be true and correct to the best of my knowledge, information and belief.

DATED: April 10, 2012

RALPH MALLOZZI

# EXHIBIT A



## CAMBRIDGE SECURITY SEALS' NEW HEAVY DUTY PULL TIGHT SEAL OFFERS IMPROVED SECURITY AND STRENGTH

*The New Tamper Evident Seal Provides Customers with Cost Effective and Eco-Friendly Solutions*

**POMONA, New York, February 3, 2012** – Cambridge Security Seals (CSS), the quality leader in tamper resistant and loss prevention seals, announces today the availability of its new Heavy Duty Pull Tight seal (HPT). The streamlined design of the HPT not only strengthens the seal, but makes it smoother and easier to use when securing items.  CSS's design gives the HPT a uniquely thin diameter while offering 40 percent more tensile strength than similar alternatives.

The HPT also features CSS's unique Clean Break Design™, which both reduces cost and waste because individual seals detach from the strip without any material left over. Cambridge Security Seals offers its Heavy Duty Pull Tight security seals in four lengths (9",12",15", and 18") and seven colors, and provides customers with an unsurpassed ability to customize their seals with logos, printed information, variable numbering, and barcodes.

"Part of our commitment to our customers is the constant pursuit of better designs for the seals that protect their valued assets," said Elisha Tropper, Cambridge Security Seals President & CEO.  "Our team of engineers has produced a durable product that can secure items through even smaller apertures, with even more important information provided by the seal. The initial response has been very enthusiastic and we expect it will be an important part of our line for years to come."

CSS provides a wide array of plastic, metal, and electronic seals along with other aligned products that deter theft, secure a chain of custody, and provide evidence of tampering. The company services a diverse customer base spanning a variety of industries, including freight logistics and distribution, trucking, retail, cash handling, airlines, rail transportation, government, pharmaceutical, food and beverage, medical, and agriculture.

For more information about Cambridge Security Seals and their products, please visit www.cambridgeseals.com.

**About Cambridge Security Seals**

Cambridge Security Seals, a privately-held enterprise headquartered in Pomona, New York, offers an extensive line of tamper evident, tamper resistant, and high-security loss prevention seals to customers across a wide range of industries. The company's 60 year legacy of dedication to quality, customer service and value provides a blueprint for reliability and security.

Cambridge Security Seals' commitment to technology, quality standards, environmental responsibility, and attention to detail fuels its drive to provide security-conscious customers with the products and services they demand from an industry leader.

The backbone of Cambridge Security Seals is a diversified team of technical experts and business professionals, including experienced engineering, production, and logistics specialists. This unique blend of management and production expertise enables the company to provide an unmatched level of value. For more information about Cambridge Security Seals, please visit http://www.cambridgeseals.com.

**Contact:**

Greg Wind
Matter Communications for Cambridge Security Seals
401-383-9560
CSS@matternow.com

# EXHIBIT B



**CAMBRIDGE SECURITY SEALS' NEW PLASTIC TRUCK SEAL SAFEGUARDS AGAINST THEFT & TAMPERING OF IMPORTANT CARGO & TRANSPORTATION EQUIPMENT**

*New Seal Offers New and Improved Tamper Evident Product Solutions*

**POMONA, New York, March 19, 2012** – Cambridge Security Seals (CSS), the quality leader in tamper resistant and loss prevention seals, announces the availability of its newest product, the Plastic Truck Seal (model number CSSPTS).  Designed specifically to detect and deter theft or contamination by providing enhanced tamper evident protection, the Plastic Truck Seal is an effective tool for securing transportation equipment such as trailer doors, bulk tankers, railroad cars, cash-in-transit and storage cabinets, totes and boxes.

The Plastic Truck Seal is made with high-density polyethylene for greater durability in extreme weather and features a high temperature resistant locking chamber. The new seal also features CSS's unique Clean Break Design™, which both reduces cost and waste because individual seals detach from the strip without any material left over. Cambridge Security Seals' Plastic Truck Seals are available in 30 lbs, 60 lbs, 90 lbs or 115 lbs tensile strength options as well as seven colors.  CSS also provides customers with an unsurpassed ability to customize their seals with logos, printed information, variable numbering, and standard barcodes including 2D/QR technology.

"We design our seals to be the most durable and cost effective products on the market for customers seeking to secure their valuable and sensitive cargo," said Elisha Tropper, Cambridge Security Seals president and CEO.  "Our new Plastic Truck Seal is the latest in our line of reliable loss prevention solutions and is sure to be a go-to product for customers who want greater assurance of secure shipments."

CSS provides a wide array of plastic, metal, and electronic seals along with other aligned products that deter theft, secure a chain of custody, and provide evidence of tampering. The company services a diverse customer base spanning a variety of industries, including freight logistics and distribution, trucking, retail, cash handling, airlines, rail transportation, government, pharmaceutical, food and beverage, medical, and agriculture.

For more information about Cambridge Security Seals and their products, please visit www.cambridgeseals.com.

**About Cambridge Security Seals**

Cambridge Security Seals, a privately-held enterprise headquartered in Pomona, New York, offers an extensive line of tamper evident, tamper resistant, and high-security loss prevention

seals to customers across a wide range of industries. The company's 60 year legacy of dedication to quality, customer service and value provides a blueprint for reliability and security. Cambridge Security Seals' commitment to technology, quality standards, environmental responsibility, and attention to detail fuels its drive to provide security-conscious customers with the products and services they demand from an industry leader.

The backbone of Cambridge Security Seals is a diversified team of technical experts and business professionals, including experienced engineering, production, and logistics specialists. This unique blend of management and production expertise enables the company to provide an unmatched level of value. For more information about Cambridge Security Seals, please visit http://www.cambridgeseals.com.

**Contact:**

Chrissy Kinch
Matter Communications for Cambridge Security Seals
401-649-4259
CSS@matternow.com

# EXHIBIT C



# CAMBRIDGE SECURITY SEALS OPENS NEW AUTOMATED MANUFACTURING FACILITY IN POMONA, NY

*The Company's Domestic Manufacturing Strategy Provides Immediate Benefits to Customers*

POMONA, New York, November 17, 2011 – Cambridge Security Seals (CSS), the quality leader in tamper resistant and loss prevention seals, announced today that it has completed its first month of shipping orders produced at its new manufacturing facility in Pomona, New York. The company was formerly a division of Cambridge Resources, a 60 year old global manufacturer of industrial products, until December 2010, at which time it transitioned into an independent entity focused on addressing the unique opportunities of the security seals market.

As one of its first business initiatives, CSS committed to constructing and operating a U.S.-based automated manufacturing plant to service its rapidly growing customer base in North America. The facility has been designed to utilize industry-leading automation, and features significant practical investments in "green" technologies, including LED lighting, smart HVAC systems, and electronic business systems that yield dramatic energy savings, and a paperless workflow and office environment.

"At a time when many in our industry are looking to expand their overseas manufacturing with the goal of reducing costs, we developed a business model based on strategic domestic manufacturing that enables us to provide higher quality products with quicker turnaround times at competitive and stable pricing," said Elisha Tropper, CEO of Cambridge Security Seals. "Launching our production in the U.S. enables us to be nimble in our response to customers, while facilitating the kind of innovation that can only emerge in a customer-focused design and manufacturing environment."

CSS provides a wide array of plastic, metal, and electronic seals along with other aligned products that deter theft, secure a chain of custody, and provide evidence of tampering. The company services a diverse customer base spanning a variety of industries, including freight logistics and distribution, trucking, retail, cash handling, airlines, rail transportation, government, pharmaceutical, food and beverage, medical, and agriculture.

"The unique market dynamics of the security seals industry provide an immediate opportunity for us to meet customer needs with quality products, customer responsiveness and value," added Tropper. "We are committed to addressing this opportunity with the capabilities and flexibility required by organizations seeking a reliable supplier of top quality security seal and asset protection products."

**About Cambridge Security Seals**

Cambridge Security Seals, a privately-held enterprise headquartered in Pomona, New York, offers an extensive line of tamper evident, tamper resistant, and high-security loss prevention seals to customers across a wide range of industries. The company's 60 year legacy of dedication to quality, customer service and value provides a blueprint for reliability and security. Cambridge Security Seals' commitment to technology, quality standards, environmental responsibility, and attention to detail fuels its drive to provide security-conscious customers with the products and services they demand from an industry leader.

The backbone of Cambridge Security Seals is a diversified team of technical experts and business professionals, including experienced engineering, production, and logistics specialists. This unique blend of management and production expertise enables the company to provide an unmatched level of value. For more information about Cambridge Security Seals, please visit http://www.cambridgeseals.com.

**Contact:**

Greg Wind
Matter Communications for Cambridge Security Seals
401-383-9560
CSS@matternow.com