UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
                                     :

E.J. BROOKS COMPANY d/b/a     :    12-CV-2937 (LAP)
TYDENBROOKS                  :

          Plaintiff,     :    MEMORANDUM & ORDER

                              :

      v.                   :

                              :

CAMBRIDGE SECURITY SEALS, et al., :

                              :

         Defendants.    :

                              :
------------------------------------X

LORETTA A. PRESKA, Chief United States District Judge:

        The above-captioned matter came before this Court for a jury trial commencing April 20, 2015.  At the conclusion of the trial, on May 4, 2015, the jury returned a unanimous verdict in favor of Plaintiff E.J. Brooks d/b/a TydenBrooks ("Plaintiff" or "Tyden") on claims of misappropriation of trade secrets, unfair competition, and unjust enrichment.  (See Jury Verdict Form, dated May 4, 2015 [dkt. no. 339] ("Verdict Form").) However, the jury did not find Defendant Cambridge Security Seals ("Defendant" or "CSS") liable on Tyden's fourth charge, conspiracy to misappropriate trade secrets.  (Id.)  The jury awarded Tyden compensatory damages against Defendant CSS of $1,300,000 for misappropriation of trade secrets, $1,300,000 for

unfair competition, and $1,300,000 for unjust enrichment.[1]   (Id.)
The Clerk of Court then entered judgment accordingly.   (See
Judgment, dated May 13, 2015 [dkt. no. 321] ("Judgment").)

Defendant CSS has now moved for judgment as a matter
of law or a new trial pursuant to Federal Rules of Civil
Procedure 50 and 59 or, in the alternative, to alter or amend
the judgment under Rule 59.  (Def.'s Mot. to Vacate or Modify
the Judgment, dated June 11, 2015 [dkt. no. 342] ("CSS' Mot.").)
For the following reasons, Defendant's motion is DENIED.

I.   BACKGROUND

Plaintiff Tyden brought an action against Defendant
CSS alleging, among other claims, misappropriation of trade
secrets, conspiracy to misappropriate trade secrets, unfair
competition, and unjust enrichment.  (See Pl.'s Am. Compl.,
dated Oct. 22, 2013 [dkt. no. 104].)  CSS responded by Answer
and asserted a counterclaim, alleging that Tyden's suit

---

[1] The jury also awarded compensatory damages against the
individual Defendants as follows: against Brian Lyle of $2,000
for unfair competition and $2,000 for unjust enrichment; against
Gurmeet Singh Grover ("Grover Singh") of $2,000 for
misappropriation of trade secrets, $2,000 for unfair
competition, and $2,000 for unjust enrichment; and against
Michael Gizzarelli of $2,000 for misappropriation of trade
secrets, $2,000 for unfair competition, and $2,000 for unjust
enrichment.  The present motion was brought only by Defendant
CSS and not by the individual Defendants, though these parties
will be referred to collectively herein as the "Defendants."

constituted tortious interference with a prospective contract.
(See Defs.' Answer, filed Nov. 21, 2013 [dkt. no. 117].)

In anticipation of trial, the parties each made
motions in limine. (Notice of Pl.'s Mots. in limine, dated Jan.
29, 2015 [dkt. no. 217]; Notice of Defs.' Mots. in limine, dated
Jan. 30, 2015 [dkt. no. 225].)  The Court granted several of
Tyden's motions, including motions to exclude evidence of
Tyden's operational problems, the reduction of its workforce,
and the offshoring of its manufacturing facilities. (See Order,
dated Mar. 18, 2015 [dkt. no. 280].)  The Court also granted in
part and denied in part CSS' motions to exclude certain proposed
testimony of Tyden's expert witnesses, Dr. James Kirk and Dr.
William Howard.  The Court barred both Dr. Howard and Dr. Kirk
from testifying whether Tyden's manufacturing processes
constitute trade secrets. (See Order, dated Apr. 15, 2015 [dkt.
no. 308], at 2-3.)  However, the Court permitted Dr. Howard to
testify as to the likelihood of CSS' developing and implementing
its manufacturing processes without the knowledge and use of
Tyden's processes. (Id. at 2.)  The Court also allowed Dr. Kirk
to testify whether Tyden's manufacturing processes add value to
its business and whether CSS' machines appear to be copies of
Tyden's. (Id.)

In addition to its motions in limine, CSS filed a pre-
trial motion for judgment as a matter of law. (See Defs.' Mot.

3

for Judgment as a Matter of Law, dated Mar. 30, 2015 [dkt. no. 284].)  The Court denied this motion without prejudice to renewal after Tyden concluded its direct case.  (See Order, dated Apr. 2, 2015 [dkt. no. 287].)

Trial commenced on April 20, 2015.[2]  After opening statements, Tyden called several current and former Tyden employees, including Mr. Boyd Coggins and Mr. Ralph Mallozzi. Mr. Coggins, a current Tyden employee, testified about his personal knowledge of Tyden's (and its predecessor company, Stoffel Seal's) manufacturing processes for different types of plastic indicative security seals.  (See, e.g., Tr. 63-146.) Mr. Mallozzi, a former Tyden employee who spent twenty years at the company, described Tyden's policies and procedures for maintaining the confidentiality of its manufacturing processes. (See, e.g., Tr. 388:22-391:24.)

Tyden also called several expert witnesses.  Dr. Kirk testified that, after comparing Tyden's manufacturing processes for plastic indicative seals with the corresponding CSS processes, he found that CSS had essentially copied Tyden's processes.  (Tr. 199:13-200:2, 201:8-259:2.)  Dr. Howard

---

[2] The trial transcript is available on ECF as follows (all dates 2015): April 20 [dkt. no. 324]; April 21 [dkt. no. 326]; April 22 [dkt. no. 328]; April 23 [dkt. no. 330]; April 24 [dkt. no. 332]; April 27 [dkt. no. 334]; May 4 [dkt. no. 336].  All references to the trial transcript herein are denoted as "Tr."

testified that it would be "extraordinarily unlikely" for two engineering groups, such as CSS and Tyden, to develop nearly identical manufacturing processes and that it would have taken CSS "considerably longer" to develop and implement its manufacturing processes without knowledge and use of Tyden's processes. (Tr. 529:18-530:1, 530:3-531:6.)  Finally, Tyden's damages expert, Dr. Robert Vigil, testified that an appropriate measure of damages in this case would be based on the amount CSS "gained" by avoiding the costs of developing its own manufacturing processes.  (Tr. 696:13-697:1.)

        At the close of Tyden's evidence, the Defendants renewed their motion for judgment as a matter law, which the Court denied.  (See Tr. 790:07-11, 816:03-04.)  The Defendants then offered testimony from several of their own witnesses and, following summations, the case was submitted to the jury.  The jury found CSS and certain individual Defendants liable for misappropriation of trade secrets, unfair competition, and unjust enrichment.  (See Verdict Form [dkt. no. 339].)  The jury awarded Tyden compensatory damages against Defendant CSS in the total sum of $3,900,000 and against certain individual Defendants for lesser amounts.  (See Judgment [dkt. no. 321].)  Subsequently, CSS filed a motion to vacate or modify the judgment (CSS' Mot. [dkt. no. 342]).

II.  LEGAL STANDARDS

A.  Fed. R. Civ. P. ("Rule") 50(b)

Federal Rule of Civil Procedure ("Rule") 50(b)
provides that a party, having made a prior motion for judgment
as a matter of law that was denied, "may file a renewed motion
for judgment as a matter of law" after entry of the judgment.
Fed. R. Civ. P. 50(b).  A party's post-trial motion, though, "is
limited to those grounds that were 'specifically raised in the
prior motion for [JMOL].'" McCardle v. Haddad, 131 F.3d 43, 51
(2d Cir. 1997) (quoting Samuels v. Air Transport Local 504, 992
F.2d 12, 14 (2d Cir. 1993)).  "[I]f an issue is not raised in a
previous motion for a directed verdict, a Rule 50(b) motion
should not be granted unless it is 'required to prevent manifest
injustice.'" Cruz v. Local Union No. 3 of Int'l Bhd. Of Elec.
Workers, 34 F.3d 1148, 1155 (2d Cir. 1994) (quoting Baskin v.
Hawley, 807 F.2d 1120, 1134 (2d Cir. 1986)).

If an issue has been raised previously, a district
court may set aside a jury verdict and grant the moving party
judgment as a matter of law where:

> (1) there is such a complete absence of evidence
> supporting the verdict that the jury's findings could
> only have been the result of sheer surmise and
> conjecture, or (2) there is such an overwhelming
> amount of evidence in favor of the movant that
> reasonable and fair minded persons could not arrive at
> a verdict against it.

6

McClain v. Pfizer, Inc., 505 F. App'x 59, 61 (2d Cir. 2012)
(summary order) (quoting Millea v. Metro-N. R.R. Co., 658 F.3d
154, 161 (2d Cir. 2011)).  In making its determination, a court
"'must give deference to all credibility determinations and
reasonable inferences of the jury,' and may not weigh the
credibility of witnesses or otherwise consider the weight of the
evidence."  Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133
(2d Cir. 2008) (quoting Caruolo v. John Crane, Inc., 226 F.3d
46, 51 (2d Cir. 2000)).  Thus, judgment as a matter of law
"should be granted cautiously and sparingly."  Meloff v. N.Y.
Life Ins. Co., 240 F.3d 138, 145 (2d Cir. 2001) (citation
omitted).

     B.   Fed. R. Civ. P. ("Rule") 59(b)

          At the same time that a party makes a post-trial
motion under Rule 50(b), it also may raise a motion for a new
trial under Fed. R. Civ. P. ("Rule") 59(b).  Unlike a Rule 50
motion, a court may independently weigh the evidence when
evaluating a motion for a new trial and can grant the motion
despite the existence of "substantial evidence" supporting the
verdict.  See DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d
124, 134 (2d Cir. 1998).  However, a motion for a new trial
should be granted only when the court "'is convinced that the
jury has reached a seriously erroneous result or that the

verdict is a miscarriage of justice.'" R.R. Love, Ltd. v. TVT Music, Inc., 282 F. App'x 91, 93 (2d Cir. 2008) (summary order) (quoting DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001)).

In particular, "'[i]f a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount.'" Lee v. Edwards, 101 F.3d 805, 808 (2d Cir. 1996) (quoting Tingley Sys. Inc. v. Norse Sys., Inc., 49 F.3d 93, 96 (2d Cir. 1995)). See generally Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 433 (1996). The Court of Appeals has identified two distinct types of cases in which a conditional remittitur is appropriate:

> (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, . . . and (2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.

Kirsch v. Fleet St. Ltd., 148 F.3d 149, 165 (2d Cir. 1998) (quoting Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 337 (2d Cir. 1993)).

C.   Fed. R. Civ. P. ("Rule") 59(b)

Under Fed. R. Civ. P. ("Rule") 59(e), a party also may bring a post-verdict motion "to alter or amend a judgment."

8

Fed. R. Civ. P. 59(e).  Rule 59(e) "'covers a broad range of motions,' and . . . 'the only real limitation on the type of the motion permitted is that it must request a substantive alteration of the judgment, not merely the correction of a clerical error, or relief of a type wholly collateral to the judgment.'"  ING Global v. United Parcel Serv. Oasis Supply Corp., 757 F.3d 92, 96 (2d Cir. 2014) (quoting Schwartz v. Liberty Mut. Ins. Co., 539 F.3d 135, 153 (2d Cir. 2008)).

However, "[g]enerally, district courts will only amend or alter a judgment pursuant to Rule 59 'to correct a clear error of law or prevent manifest injustice.'"  In re Assicurazioni Generali, S.P.A., 592 F.3d 113, 120 (2d Cir. 2010) (quoting Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004)).  Thus, this standard "provide[s] relief only in the proverbial 'rare case.'"  Corsair Special Situations Fund, L.P. v. Nat'l Res., 595 F. App'x 40, 44 (2d Cir. 2014) (summary order) (citation omitted); see also Space Hunters, Inc. v. United States, 500 F. App'x 76, 81 (2d Cir. 2012) (summary order) ("[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." (quoting Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995))).

III. DISCUSSION

    A.    <u>Defendant CSS is Not Entitled to Judgment as a Matter</u>
        <u>of Law or a New Trial on the Issue of Avoided Costs</u>

        1.  <u>Avoided Costs are an Appropriate Measure of Damages</u>

In the motion before this Court, CSS renews its objection to avoided development costs as a measure of damages. (<u>See</u> Def.'s Mem. in Supp. of Mot. to Vacate, dated June 11, 2015 [dkt. no. 343] ("CSS' Mem."), at 4-6; Def.'s Reply Mem. in Supp. of Mot. to Vacate, dated Aug. 3, 2015 [dkt. no. 349] ("CSS' Reply"), at 1-3.) Tyden maintains, as it did both prior to and at trial, that avoided development costs are an appropriate measure of damages. (<u>See</u> Pl.'s Mem. in Opp'n to Def.'s Mot. to Vacate, dated July 15, 2015 [dkt. no. 346] ("Tyden's Opp'n"), at 3-6.) When CSS raised its objection to this measure of damages at trial, the Court considered CSS' argument, rejected it, and instructed the jury on avoided development costs. (Tr. 816:3-4, 1067:1-1068:21.) Here, the Court again rejects CSS' argument for substantially the same reasons.

CSS correctly notes that, in this Circuit, "the amount of damages recoverable in an action for misappropriation of trade secrets may be measured either by the plaintiff's losses . . . or by the profits unjustly received by the defendant." <u>A.F.A. Tours, Inc. v. Whitchurch</u>, 937 F.2d 82, 87 (2d Cir.

1991).  A third measure of damages, a "reasonable royalty," also may be used in cases where these two methods of calculating damages provide inadequate compensation to plaintiff.  See LinkCo, Inc. v. Fujitsu Ltd., 232 F. Supp. 2d 182, 186-87 (S.D.N.Y. 2002).

CSS suggests that the Court should adopt a strict interpretation of "profits" and "losses," which does not include avoided development costs as a measure of damages.  (See CSS' Mem. [dkt. no. 343], at 4; CSS' Reply [dkt. no. 349], at 1 ("No New York case authorizes 'avoided costs.'").)  Further, CSS argues that, in the absence of calculable profits or losses, a reasonable royalty should be the only alternate measure of damages.  (See CSS' Reply [dkt. no. 349], at 1.)

However, CSS' suggested interpretation of these terms is too narrow.  CSS' avoided development costs could just as aptly be categorized as Tyden's "losses" or CSS' "gains".  In this Circuit, courts have adopted liberal readings of these categories and, in particular, "have diverged from a straight lost profits analysis in cases where plaintiff's losses and defendant's actual gain cannot be easily computed."  LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 503 (S.D.N.Y. 2002); see also Matarese v. Moore-McCormack Lines, 158 F.2d 631, 637 (2d Cir. 1946) ("Where the fact of damages is certain, the uncertainty of the amount will not prevent their being

11

assessed."); In re Cross Media Mktg. Corp., 2006 WL 2337177, at *6 (S.D.N.Y. Aug. 11, 2006) ("'[T]he lack of actual profits does not insulate the defendants from being obliged to pay for what they have wrongfully obtained.'" (quoting Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 536 (5th Cir. 1974))).

Thus, as in the present case, a plaintiff's losses or a defendant's gains may be measured by the avoided cost of developing the trade secret.  Indeed, this methodology has been implicitly recognized in this Circuit.  See, e.g., Matarese, 158 F.2d at 635-37 (affirming damages for an unjust enrichment claim based on misappropriation of information by calculating the costs avoided by defendant); In re Cross Media Mktg. Corp., 2006 WL 2337177, at *5 ("[T]he plaintiff's losses . . . may include the cost of developing the trade secret."); LinkCo, 232 F. Supp. 2d at 185 ("[D]amages may be measured according to any losses plaintiff suffered from the alleged misappropriation. Plaintiff's losses may include the cost of developing the trade secret . . . ."). See also Restatement (Third) of Unfair Competition § 45 cmt. f (1995) ("If the benefit derived by the defendant consists primarily of cost savings, such as when the trade secret is a more efficient method of production, the 'standard of comparison' measure that determines relief based on the savings achieved through the use of the trade secret may be the most appropriate measure of relief.").

In In re Cross Media Mktg. Corp., for example, the
court affirmed that the defendants, who had stolen the
plaintiff's customer list and had attempted to auction it off,
were guilty of misappropriation of trade secrets and unjust
enrichment.  2006 WL 2337177, at *5-6.  Although the defendants
had not actually made any profits from their theft, the court
found that the appropriate extent of damages could be calculated
based on how much it had cost the plaintiff to develop the
customer list.  Id. ("The Bankruptcy Court's award of damages
based upon Cross Media's loss, calculated by determining the
development cost of the customer lists, was adequate to
compensate Cross Media and properly determined.")

Several other Circuits also have recognized this
method of calculating damages.  See, e.g., Wellogix, Inc. v.
Accenture, L.L.P., 716 F.3d 867, 879 (5th Cir. 2013) ("Damages
in misappropriation cases can [include] . . . the development
costs the defendant avoided incurring through misappropriation .
. . ." (citation omitted)); Bourns, Inc. v. Raychem Corp., 331
F.3d 704, 710 (9th Cir. 2003) (affirming award of damages based
on avoided development costs in misappropriation case); Avery
Dennison Corp. v. Four Pillars Enter. Co., 45 F. App'x 479, 486
(6th Cir. 2002) (per curiam) (misappropriation damages may be
based on "the value derived from savings because of increased
productivity, or the value derived from savings in research

13

costs"); Telex Corp. v. IBM Corp., 510 F. 2d 894, 930-32 (10th
Cir. 1975) (per curiam) (same), cert. denied, 423 U.S. 802
(1975), abrogation on other grounds recognized by Novell Inc. v.
Microsoft Corp., 731 F.3d 1064 (10th Cir. 2013); Int'l Indus.,
Inc. v. Warren Petroleum Corp., 248 F.2d 696, 702 (3d Cir. 1957)
("Where the thing appropriated or infringed is a process rather
than a manufactured article, the profits are simply measured by
the savings determined by the standard of comparison
computation."), cert. denied, 355 U.S. 943 (1958).

        Similarly, in the instant case, Tyden suggests that
CSS' avoided development costs are one method of measuring CSS'
unjust gains.  As Tyden argues, "CSS 'profited' from its theft
of Tyden's trade secret by avoiding the significant research and
development, labor and capital costs it would have incurred had
it developed its own processes for manufacturing plastic
indicative seals from scratch."  (Tyden's Opp'n [dkt. no. 346],
at 6.)

        This theory of damages was supported by Tyden's
damages expert, Dr. Vigil.  (See Tr. 696:13-697:1; see also
Decl. of Michel, dated Mar. 30, 2015 [dkt. no. 294] Ex. W-1
("Vigil Report"), at 34-37.)  Dr. Vigil noted in his expert
report that, although he had found "evidence that TydenBrooks
lost sales and profits as a result of Cambridge's
misappropriation of trade secrets . . . [he was] unable to

14

precisely quantify the exact amount of sales TydenBrooks lost due to Cambridge's theft of TydenBrook's trade secrets." (Vigil Report [dkt. no. 294], at 2.) Dr. Vigil testified at trial, therefore, that a more appropriate method of calculating damages in the instant case would be based on the Defendant's "disgorgement of unjust gains" and that "[a]voided costs would be a type of disgorgement." (Tr. 696:15-20.) This disgorgement, Dr. Vigil described, could be calculated by determining "how much [a company] gain[ed] by taking and using information that didn't belong to them." (Tr. 696:21-23.) Dr. Vigil further noted that this analysis would apply not only to the misappropriation of trade secrets claim, but also to Tyden's unfair competition and unjust enrichment claims. (Tr. 709:3-7, 709:17-19.)

Indeed, at trial, the jury was instructed to calculate the damages based on the "benefits derived by the defendant" and the "costs avoided by the defendant." (Tr. 1067:4-8.) The Court further explained to the jury that, in evaluating cost savings, the jury must "compare actual costs incurred by the defendant . . . with the costs [the defendant] would have incurred to produce the same products without the use and knowledge of TydenBrooks' manufacturing process" and that it was the difference in these costs that the jury should award as damages. (Tr. 1068:9-21.) Thus, as the jury found, CSS

15

unjustly gained because it was able to avoid the costs associated with developing its own manufacturing processes.

Finally, the Court notes that CSS had more-than-adequate notice of Tyden's theory of damages. Dr. Vigil laid out the avoided costs theory of damages in his June 2, 2014 expert report, nearly one year before the trial commenced. (See Vigil Report [dkt. no. 294] Ex. W-1, 34-37.) Additionally, as described above, Dr. Vigil testified at length during the trial about this theory of damages and CSS subsequently cross-examined Dr. Vigil on this topic. (Tr. 696:13-697:1, 698:12-708:19.)

Accordingly, for these reasons, the Court again determines that avoided development costs are an appropriate measure of damages in this case and DENIES Defendant CSS' motion on this basis.

### 2. Defendants Proximately Caused Tyden's Injury

For the first time, CSS raises in its motion before the Court that Tyden did not prove Defendants' conduct proximately caused injury to Tyden. However, a party's post-trial motion "is limited to those grounds that were 'specifically raised in the prior motion for [JMOL].'" McCardle, 131 F.3d at 51 (quoting Samuels, 992 F.2d at 14). While courts reserve the discretion to grant judgment as a matter of law even when an issue has not been previously raised

in a motion, such discretion is reserved for cases of "manifest injustice" and no such case is presented here.  See Cruz, 34 F.3d at 1155.

CSS previously submitted two motions for a directed verdict.  First, CSS filed a pre-trial motion for judgment as a matter of law.  Although CSS argued in its pre-trial motion that Tyden's avoided costs theory of damages should not be applied, CSS did not raise any arguments concerning injury or proximate cause.  (See Defs.' Mot. for Judgment as a Matter of Law, dated Mar. 30, 2015 [dkt. no. 284].)  The Court rejected the motion without prejudice to renewal after Plaintiff rested its case.  (See Order, dated April 2, 2015 [dkt. no. 287].)  Second, at trial, CSS renewed the same motion for a directed verdict after Tyden finished presenting its evidence.  (See Tr. 790:7-11.)  Although CSS had the opportunity to do so, it did not articulate any additional grounds for a directed verdict or challenge the sufficiency of Tyden's evidence for either proximate cause or injury.  (Id.)  The Court again rejected CSS' motion for a directed verdict.  (See Tr. 816:3-4.)  Thus, in light of these previous motions, CSS is now procedurally barred from raising such an argument in its instant motion for judgment as a matter of law.  See McCardle, 131 F.3d at 51.

Even if CSS' arguments concerning injury and proximate cause had been preserved, these arguments still would fail on

17

the merits.  CSS contends that because the jury did not find
Tyden liable for conspiracy to misappropriate trade secrets, the
only claim for which the jury was explicitly instructed to find
injury and causation, the jury did not find that these elements
existed for the other claims.  (CSS' Mem. [dkt. no. 343], at 8
("The conspiracy claim was the only cause of action that
explicitly required proof of causation and injury as a distinct
element of the claim.").)  This is mere speculation that does
not warrant a vacatur or re-trial.  Indeed, the Court
specifically instructed the jury that it "may award compensatory
damages only for injuries that TydenBrooks proves were
proximately caused by a defendant's allegedly wrongful conduct"
(Tr. 1065:20-22) and that it "should not award compensatory
damages for speculative injuries, but only for those injuries
that TydenBrooks has actually suffered or which it is reasonably
likely to suffer in the near future" (Tr. 1065:24-1066:2).

As was demonstrated at trial, CSS' interference with
Tyden's trade secret was the injury that the damages in this
case were intended to rectify.  See Ruckelshaus v. Monsanto Co.,
467 U.S. 986, 1011 (1984) ("With respect to a trade secret, the
right to exclude others is central to the very definition of the
property interest."); In re Cross Media Mktg. Corp., 2006 WL
2337177, at *4-6 (finding damages appropriate on the basis of
defendant's avoided costs because defendant had misappropriated

plaintiff's customer list).  Indeed, at trial, Tyden offered
evidence that the Defendants stole Tyden's trade secret to set
up nearly-identical manufacturing processes and, as a result,
CSS was able to avoid costs that it would have otherwise
incurred to develop such processes.  (See, e.g., Tr. 201:8-
259:5, 295:14-297:10, 614:8-14.)  This evidence was sufficient
for a reasonable jury to conclude that the Defendants' actions
proximately caused Tyden's injuries, and therefore the Court
also DENIES CSS' motion on this basis.

### 3. CSS Was Properly Precluded from Introducing Certain Evidence Concerning Damages and Proximate Cause

Finally, CSS argues that a new trial is necessary
because the Court barred CSS from countering Tyden's claims with
its own evidence disproving causation and damages.  (CSS' Mem.
[dkt. no. 343], at 9.)  However, CSS chose not to call its own
damages expert, Dr. Robert Trout, despite having informed the
Court on multiple occasions that it would do so.  (Tr. 597:11-
14, 908:14-15.)  Further, the evidence that CSS attempted to
admit and that the Court barred from trial was not relevant to
the theory of damages at issue in this case and, therefore,
would not have disproven causation or damages.  For example,
prior to trial, CSS sought to introduce evidence regarding
Tyden's reductions in its domestic workforce and various
operational problems.  Tyden then filed a motion in limine to

preclude this evidence.  (Notice of Pl.'s Mot. in limine, dated
Jan. 29, 2015 [dkt. no. 217].)  The Court granted Tyden's motion
finding that, among other reasons, this evidence was not
relevant to Tyden's avoided costs theory of damages.  (See
Order, dated Mar. 18, 2015 [dkt. no. 280].)

        Similarly, at trial, CSS attempted to cross-examine
Tyden's damages expert, Dr. Vigil, on topics that did not relate
to the avoided costs theory of damages and on evidence which did
not form the basis of Dr. Vigil's opinions.  (Tr. 693:1-694:13,
695:22-696:2, 697:2-11.)  Accordingly, the Court sustained
several objections during CSS' cross-examination.  (Id.)  See
LinkCo, 232 F. Supp. 2d at 185 (barring evidence of plaintiff's
sales projections and defendant's actual profits on the basis
that such evidence would be irrelevant to the measure of
damages).  Thus, because CSS was not barred from providing
evidence that was relevant to the theory of damages at issue in
this case, a new trial is not warranted and CSS' motion is
DENIED on this basis.

    B.   Defendant CSS is Not Warranted Judgment as a Matter of
         Law on Tyden's Misappropriation of Trade Secrets Claim

        CSS also argues that, despite the jury's verdict, the
Court should grant it judgment as a matter of law on Tyden's
misappropriation of trade secrets claim because Tyden failed to
prove that it possessed a trade secret.  (CSS' Mem. [dkt. no.

                                20

343], at 10-15.)  CSS, however, has not shown that there was either "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture" or that there is such an "overwhelming amount of evidence in favor of [CSS] that reasonable and fair minded persons could not arrive at a verdict against it."  See McClain, 505 F. App'x at 61.

The existence of a trade secret is a question of fact that may be determined by the jury.  See Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 174 (2d Cir. 1990).  New York courts have defined a trade secret as "'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'"  Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 118 F.3d 955, 968 (2d Cir. 1997) (quoting Restatement of Torts § 757 cmt. b, at 5 (1939)).  "'[I]t is not simply information as to single or ephemeral events in the conduct of the business;' rather, it 'is a process or device for continuous use in the operation of the business.'"  Id. (citation omitted).  The following factors may be relevant in determining whether a trade secret exists:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the

21

business; (3) the extent of measures taken by the
business to guard the secrecy of the information; (4)
the value of the information to the business and its
competitors; (5) the amount of effort or money
expended by the business in developing the
information; [and] (6) the ease or difficulty with
which the information could be properly acquired or
duplicated by others.

United States v. Mahaffy, 693 F.3d 113, 134 (2d Cir. 2012)

(quoting N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d

Cir. 1999)).

     In the instant case, the jury found Defendants guilty

of misappropriating a trade secret and, therefore, must have

determined that Tyden had a trade secret that could be

misappropriated.  CSS still argues, though, that Tyden did not

prove it possessed a trade secret because (1) Tyden did not

sufficiently identify its trade secret when it was initially

disclosed to the Defendants or at trial; (2) the alleged trade

secret was not unique; and (3) the alleged trade secret did not

give Tyden a competitive advantage.  (CSS' Mem. [dkt. no. 343],

at 10-15.)  Although the Court will address each of CSS'

arguments below, CSS has not met the high bar required for

judgment as a matter of law and, therefore, the Court declines

to disturb the jury's determination on this claim.

     1. Tyden Identified its Manufacturing Processes with
       Reasonable Particularity

First, CSS contends that Tyden did not describe its alleged trade secret with sufficient particularity when it was initially disclosed to the Defendants or throughout the litigation.  CSS alleges that because Tyden did not use the term "trade secret" in its communications with its employees and only used the term during its closing argument at trial, "it was impossible for the jury to find that [Tyden] 'possessed a trade secret, identifiable with reasonable particularity.'"  (CSS' Mem. [dkt. no. 343], at 12 (citing Tr. 1059:20-21).)

CSS correctly argues that if a trade secret is disclosed in "vague and indefinite" terms, it does not receive the protection of trade secret laws. Heyman v. AR. Winarick, Inc., 325 F.2d 584, 590 (2d Cir. 1963) (finding "plaintiff's casual reference to a 'quaternary' was so vague and indefinite as not to be entitled to protection under the law of trade secrets").  However, a trade secret does not need to be referred to as a "trade secret" to be identified with sufficient particularity. See Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d 224, 261 (S.D.N.Y. 2014) (finding plaintiff "need not have said the words 'trade secret'"), aff'd, 610 F. App'x 69 (2d Cir. 2015) (summary order).  Instead, enough "[s]pecificity is required at the moment of divulging so that the party to whom the secret is revealed understands the contours of the secret information and does not inadvertently or

23

purposefully transgress its boundaries." Sit-Up Ltd. v.
IAC/InterActiveCorp., No. 05 CIV. 9292 (DLC), 2008 WL 463884, at
*11 (S.D.N.Y. Feb. 20, 2008); see also Heyman, 325 F.2d at 590.

Additionally, several courts in this district and
other Courts of Appeals have noted that a trade secret must be
identified with particularity during litigation. See, e.g., Big
Vision, 1 F. Supp. 3d at 258-259 (collecting cases). Such
specificity allows a defendant to "defend himself adequately
against claims of trade secret misappropriation" and a jury to
properly render its verdict. See Sit-Up Ltd., 2008 WL 463884,
at *11; see also Big Vision 1 F. Supp. 3d at 258-259.

Even assuming that this Court also adopts such a
requirement, Tyden introduced sufficient evidence for a
reasonable jury to conclude that a trade secret was identified
with particularity both at the time of disclosure and during
litigation. From the very beginning of the trial, Tyden
described the parameters of the trade secret at issue. Tyden
noted in its opening statement that the case concerned the
misappropriation of its manufacturing processes used to create
the "Tug Tite seal," two other "Tug Tite-like processes that
[were used to] make lighter versions of the seal," and its
"truck seal." (See, e.g., Tr. 31:3-6, 31:17-21, 33:15-20.)
Tyden's witnesses specified that the design and operation of
Tyden's fully-automated manufacturing processes were the trade

24

secrets at issue (see, e.g., Tr. 147:20-25, 165:6-13) and
described in detail how the manufacturing processes were
programmed to operate in this fully-automated manner (see, e.g.,
Tr. 76:1-114:13, 123:24-144:3).

Further, the individual Defendants testified that they
were aware that certain information, including the design of
Tyden's manufacturing processes, was confidential and
proprietary.  Defendant Gizzarelli noted that he had signed a
"statement of principles of conduct," which informed employees
of their continuing obligations to "maintain the confidentiality
of confidential or proprietary information, including trade
secrets."  (See Tr. 461:24-462:5, 463:10-464:10.)  Defendant
Singh stated that he understood that Tyden's design drawings for
its manufacturing processes, in particular, "were marked with
the word confidential," were only accessible to a "select number
of employees," and "were not to be shared" with Tyden's
competitors.  (Tr. 295:14-297:10.)  Mr. Coggins also confirmed
the limited accessibility of the engineering designs for the
manufacturing processes, noting that "anybody on the floor,
sales or anybody else, can't access those prints."  (Tr. 183:15-
184:3.)

Additionally, Tyden introduced evidence that, after
the individual defendants left their employment with Tyden, they
took steps to conceal that they had taken information about

Tyden's manufacturing processes.   (See, e.g., Tr. 614:8-14.)
Such actions were further evidence that Defendants knew they
were misappropriating trade secrets.   See Bourns, 331 F.3d at
709 (affirming jury's trade secret finding where "[defendant]
showed its awareness of its illegal conduct by covering up its
use of [plaintiff's] information").   Thus, a jury could have
reasonably concluded that there was a trade secret at issue and
that the Defendants understood the "contours of the secret
information" both at the time the information was divulged and
throughout litigation.   See Sit-Up Ltd., 2008 WL 463884, at *11.

> 2. Tyden Demonstrated That its Manufacturing Processes
> Were Unique

Second, CSS argues that Tyden's manufacturing
processes consisted of publicly-available components that were
not combined in a unique manner.   However, as CSS suggests, a
trade secret may exist when "'characteristics and components,
each of which, by itself, is in the public domain, but the
unified process and operation of which, in unique combination,
affords a competitive advantage and is a protectable secret.'"
Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions,
Inc., 732 F. Supp. 370, 376 (S.D.N.Y. 1989) (quoting Imperial
Chem. Indus. Ltd. v. Nat'l Distillers & Chem. Corp., 342 F.2d
737, 742 (2d Cir. 1965)), aff'd, 920 F.2d 171 (2d Cir. 1990)

Tyden's witness testified that although some of the component parts of Tyden's manufacturing processes could be purchased as-is, many of the individual components were designed or created by Tyden.  (Tr. 108:10-19, 160:14-16, 163:14-22.) Mr. Coggins, for example, noted that Tyden created its own cage picking system (Tr. 161:8-10) and designed its own assembly table (Tr. 108:15-19).  Mr. Coggins also noted that Tyden's "very unique programming system" ensured that all of the component parts were synchronized and could operate without any human intervention.  (Tr. 91:4-13.)  As a result, Tyden's witnesses testified, the design and operation of Tyden's manufacturing processes was the product of a "long series of lots and lots of choices."  (Tr. 531:17-23.)

Additionally, Tyden's former Global Vice-President for Sales and Marketing, Mr. Mallozzi, described that he had become "very familiar" with the manufacturing processes of other plastic seal manufacturers and that none of these manufacturers used a fully-automated process.  (Tr. 379:19-380:6, 387:2-388:21.)  Similarly, one of Tyden's expert witnesses—Dr. Howard— testified that the manufacturing processes of thirteen of Tyden's competitors were not "remotely similar to the way that Stoffel does it."  (Tr. 537:14-19.)  Thus, based on this testimony, there was sufficient evidence for the jury to conclude that Tyden designed and operated a unique manufacturing

process that could not be purchased off-the-shelf and which was not currently being used by its competing manufacturers.

### 3. Tyden Demonstrated that its Manufacturing Processes Gave it a Competitive Advantage

Third, and finally, CSS argues that Tyden did not provide any evidence that its manufacturing processes gave it a competitive advantage. As the Court of Appeals has noted, a trade secret must give "an opportunity to obtain an advantage over competitors who do not know or use it." Softel, 118 F.3d at 968 (quoting Restatement of Torts § 757 cmt. b, at 5 (1939)); see also Ruckelshaus, 467 U.S. at 1011 n.15, 1012 ("[T]he value of a trade secret lies in the competitive advantage it gives its owner over competitors.").

Tyden's witnesses testified that the manufacturing processes at issue in this case were more efficient and produced higher-quality products than other processes Tyden previously used or that are used by Tyden's competitors. As Mr. Coggins explained, Tyden refined its manufacturing processes over a long period of time to "stay competitive in today's market." (Tr. 57:4-7.) These refinements eventually resulted in the fully-automated manufacturing processes that increased Tyden's output while also decreasing the number of employees required to man the machines. (Tr. 186:23-187:1.) As an example of these

improvements, Dr. Howard noted that the first generation machines that produced truck seals required "five operators to put out 3200 parts [p]er hour." (Tr. 559:15-19.) After several iterations and improvements, the Stoffel truck line now uses only one operator and produces 5,231 parts per hour. (Tr. 559:21-560:6.) Mr. Mallozzi stated that these improvements meant Tyden could supply products "with a high level of quality and security" for "thousands of customers on demand" in an expedient time frame. (Tr. 389:2-12.)

Further, Tyden's witness testified that, even compared to other manufacturers, Tyden's fully-automated processes gave it significant advantages. Mr. Mallozzi, for example, emphasized that the fully-automated manufacturing process "was literally what gave [Tyden its] edge" and that other manufacturers which did not have such processes were "certainly" at a competitive disadvantage. (Tr. 389:20-25, 418:15-19.)

Accordingly, CSS' motion for judgment as a matter of law on the basis that Tyden did not sufficiently demonstrate that it possessed a trade secret is DENIED.

### C.   The Verdict is Not Duplicative and Should be Upheld

In the alternative to these arguments, CSS moves pursuant to Fed. R. Civ. P. ("Rule") 59(e), to reduce the judgment in this case to account for allegedly duplicative

claims and damage awards.  CSS argues that the claims for unfair
competition and unjust enrichment are duplicative of the trade
secret misappropriation claim.  (CSS' Mem. [dkt. no. 343], at
15-17.)  CSS further argues that the damages, awarded separately
for each of the three claims, are also impermissibly
duplicative.  (Id. at 18-19.)  CSS therefore moves pursuant to
Rule 59(e) for the Court to reduce the total damage award from
the current total award of $3.9 million to $1.3 million, the
amount awarded for each of the three claims.  (Id. at 1, 15.)

Initially, the Court notes that "[a] court's role is
to reconcile and preserve whenever possible a seemingly
inconsistent jury verdict" and that "'juries are not bound by
what seems inescapable logic to judges.'"  Indu Craft, Inc. v.
Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995) (quoting
Morissette v. United States, 342 U.S. 246, 276 (1952)).  Thus,
while it is possible that the jury meant to compensate Tyden a
total of $1.3 million, it is "equally rational to believe" that
the jury found that Tyden suffered $3.9 million worth of damages
and merely divided the award over the three causes of action.
See id.  Further, because "[t]here is a presumption that a
jury's award is valid . . . '[t]he possibility of non-
duplicative awards is enough to sustain the jury verdict.'"
MacDermid Printing Solutions, LLC v. Cortron Corp., No. 308-CV-

01649 (MPS), 2015 WL 251527, at *12 (D. Conn. Jan. 20, 2015)

(quoting Bseirani v. Mahshie, 107 F.3d 2 (2d Cir. 1997)).

### 1. The Claims Are Not Duplicative

First, CSS argues that Tyden's claims themselves are

inherently duplicative, apart from the damages awarded by the

jury. (CSS' Mem. [dkt. no. 343], at 15-17.) CSS notes several

cases which hold that claims for unfair competition or unjust

enrichment are duplicative of a claim for misappropriation of

trade secrets when there is the same underlying factual

predicate for each claim. See, e.g., Goldemberg v. Johnson &

Johnson Consumer Cos., Inc., 8 F. Supp. 3d 467, 483 (S.D.N.Y.

2014) (finding that an unjust enrichment claim is unavailable

when it duplicates a tort claim); Ferring B.V. v. Allergan,

Inc., 4 F. Supp. 3d 612, 629 (S.D.N.Y. 2014) ("An unfair

competition claim can only survive dismissal of a duplicative

misappropriation claim if the two rest on different factual

predicates."). But see Big Vision, 610 F. App'x at 71 ("[T]he

District Court's statements on this count do not imply a

misperception that a claim of unfair competition always requires

a breach of contract or misappropriation of trade secrets . . .

. a plaintiff need not establish misappropriation of a trade

secret, then, to state a claim for unfair competition.").

However, generally, a Rule 59(e) motion to amend or

alter a decision should only be granted "where the Court has

overlooked factual issues or controlling decisions which were presented to it on the underlying motion." Tavarez v. United States, No. 96-CR-895 (SWK), 2005 WL 1500865, at *1 (S.D.N.Y. June 23, 2005). Rule 59(e) "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." Id. (citation omitted).

In ING Global v. United Parcel Serv. Oasis Supply Corp., the Court of Appeals was presented with a case in which a party sought to use a Rule 59(e) motion to "effectively seek[] judgment as a matter of law" by attempting "to have the jury's verdict . . . set aside and to have judgment entered in its favor on that issue." 757 F.3d at 96–97. Here, this Court is presented with an analogous fact pattern, in which CSS seeks to set aside the jury's award as to particular claims.

The court in ING Global held that because the party was attempting to use a Rule 59(e) motion as a vehicle for obtaining judgement as a matter of law, the party should be required to "comply with the carefully crafted structure and standards of Rules 50 and 51." Id. at 96. As the court noted, "[p]ermitting a party out of compliance with Rules 50 and 51 to prevail under Rule 59(e) would render those Rules, which are basic to the conduct of federal trials, essentially superfluous." Id. at 97. Under Federal Rules of Civil

32

Procedure 50 and 51, a party must move for judgment as a matter of law on a particular issue during the trial or object to jury instructions before they are delivered.    Fed. R. Civ. P. 50-51.

Though, in the instant case, CSS did move pursuant to Rule 50 for judgment as a matter of law before the trial (see Defs.' Mot. for Judgment as a Matter of Law, dated Mar. 30, 2015 [dkt. no. 284]), the duplicative claims issue was not raised in that motion (see Memo. of Law in Supp., dated Mar. 30, 2015 [dkt. no. 289]).    CSS merely noted in a footnote that "[i]f Tydenbrooks's trade secrets claim fails then each and every one of its remaining claims fail—as a matter of law—as they are based on CSS's purported misappropriation of trade secrets." (Id. at 1, n. 2.)    However, CSS did not argue that, if the trade secret and any of the other claims were successful, an issue of duplicative claims might arise.

Further, CSS submitted two proposed jury verdict forms, both of which asked the jury separately to apportion damages for each of the three claims (misappropriation of trade secrets, unjust enrichment, and unfair competition) and which did not indicate that any of these claims would be duplicative of one another.    (See Proposed Jury Verdict Forms, dated Apr. 8, 2015 [dkt. no. 299-1], at 5-14; Proposed Jury Verdict Forms with Amendments, dated Apr. 16, 2015 [dkt. no. 315-1], at 5-8.) Additionally, at trial, CSS' counsel stated just before his

closing argument that he had no objections to the final version of the form (Tr. 981:2-10) and, when given the opportunity to object at the close of the Court's jury charge, counsel did not do so (id. at 1075:2-6, 1076:19-22.)  Accordingly, CSS had several opportunities to resolve any potential juror confusion on this issue and, instead, took actions that arguably further compounded any such confusion.

More generally, the Court does not find that an amendment or alteration of the judgment is necessary to prevent a "manifest injustice" even assuming such claims are duplicative.  See ING Global, 757 F.3d at 96.  At trial, Dr. Vigil testified that "at a minimum, CSS gained by taking the information from [Tyden] by the amount of 6.1 to $12.2 million," (Tr. 676:11-13), and later increased that estimate to between $7.8 million and $16.6 million (Tr. 686:15-17.)  The jury's total award of $3.9 million is still significantly below the minimum recommended by Dr. Vigil and even further below the $20 million sum sought by Tyden (Tr. 1039:6-7).  Further, Dr. Vigil testified—albeit over CSS' objection—that his analysis applied to all three claims (Tr. 709:3-19), which provides a reasonable explanation for why the jury awarded the same amount for each claim.

Moreover, courts have found that where a party does not timely raise the issue of duplicative claims and where the

jury's intention is clear, the jury's award should be upheld and
any objection is waived.  See, e.g., Bender v. City of New York,
78 F.3d 787, 794 (2d Cir. 1996) ("In some cases, seemingly
duplicative awards made separately for overlapping causes of
action . . . have been sustained where it appeared that the jury
intended to award the aggregate sum."); Gentile v. Cnty. of
Suffolk, 926 F.2d 142, 154 (2d Cir. 1991) ("[T]he question of
duplicative damages was not raised by defendants in their
requests to charge or in their objections to the court's
instructions on the issue of damages, and the court correctly
instructed the jury to award only those damages that would
reasonably compensate plaintiffs. . . . The policy of deferring
to a jury verdict is a powerful one . . . ."); Shukla v. Sharma,
No. 07-CV-2972 (CBA) (CLP), 2012 WL 481796, at *12 (E.D.N.Y.
Feb. 14, 2012) ("[D]espite ample opportunity, defendants did not
object to the jury instruction or verdict form, nor did they
object to the jury's verdict after it was rendered and before
the jury was discharged. Their objection is therefore waived.").

        In the instant case, after the jury initially reported
its damages award, the Court asked the jurors to confer as to
whether they intended to award a total of $3.9 million, which
the foreperson then confirmed.  (Tr. 1103:19-25.)  Thus, because
the jury confirmed that it intended to award a total of $3.9

million in damages to Tyden, there can be no argument that the
jury found only $1.3 million in damages.

Accordingly, because CSS waived its objections on this
point and in deference to the jury's judgment, the Court finds
that there was no "manifest injustice" that would warrant a
remittitur or the alteration or amendment of the judgment due to
potentially duplicative claims.  Therefore, CSS' motion to
reduce the damage award on this basis is DENIED.

### 2. The Damages Are Not Duplicative

Next, CSS argues that the damages awarded by the jury
to Tyden for each of the three claims are impermissibly
duplicative.  (CSS' Mem. [dkt. no. 343], at 18-19.)  CSS is
correct that a double recovery (or, in this case, potentially a
triple recovery) is impermissible where it can be shown that
multiple awards are based on the same injury or damages.  See
Conway v. Icahn & Co., Inc., 16 F.3d 504, 511 (2d Cir. 1994)
("Where a plaintiff seeks recovery for the same damages under
different legal theories, only a single recovery is allowed.").
Therefore, were the Court to find a duplicative damage award,
even if the claims themselves were not inherently duplicative,
the Court would be required to reduce that award.  However, a
"defendant[] do[es] not demonstrate that a jury's award is
duplicative merely by noting that it allocated the damages under
two different causes of action."  Gentile, 926 F.2d at 154.

Instead, "[t]he possibility of non-duplicative awards is enough to sustain the jury verdict." MacDermid Printing Solutions, 2015 WL 251527, at *12 (citation omitted).

Here, there is, at the very least, a possibility of a non-duplicative award. First, the Court specifically instructed the jury not to make a duplicative award:

> If you find [Tyden] has prevailed on more than one claim and has established a certain dollar amount with respect to a particular injury, you may not award multiple compensatory damages for the same injury. That is, compensatory damages are only meant to make a plaintiff whole again, not to allow a plaintiff to recover more than he or she has lost. Of course, if different injuries are attributable to separate claims, then you must award individual compensatory damages for the separate injuries to compensate [Plaintiff] fully.

(Tr. 1066:16-25.)

Additionally, the jury verdict form, upon which a juror handwrote each damage award, stated that the award for each charge must not be "duplicative of any other damages you may already have awarded." (Verdict Form [dkt. no. 339].) Finally, CSS' counsel raised this issue immediately upon hearing the jury's verdict, asking the Court: "Can we just clarify the total damages, just to make sure since the numbers were all the same, to make sure that they're not duplicative of—that they were intended for each count?" (Tr. 1102:24-1103:2.) After the Court asked the jurors to confer as to whether "the total amount of damages to be awarded is the sum of the amounts listed," the

foreperson responded affirmatively, and CSS' counsel had no
further comments or objections.  (Id. at 1103:19-1104:3.)
Accordingly, CSS has not made the necessary showing that such
damages were duplicative.

In any event, to the extent that these claims or
damages could be found to be duplicative, in light of the jury's
clear intent that the amount of damages to be awarded was $3.9
million—intent manifested both by the jury's response to
questions and by the body language of the individual jurors—that
amount should be awarded on the theft of trade secrets claim and
nothing should be awarded on the unjust enrichment and unfair
competition claims. Therefore, Defendant's motion to reduce
damages is DENIED on this basis.

IV.   CONCLUSION

For the foregoing reasons, the Court DENIES Defendant
CSS' motion in its entirety.  The Clerk of Court shall mark as
closed the pending motion [dkt. no. 342] and deny as moot any
other pending motions.

SO ORDERED.
Dated:    New York, New York
          December 23, 2015


                              LORETTA A. PRESKA
                              Chief United States District Judge


38